Elaine W. Wallace [SBN 78481]
Law Offices of Elaine W. Wallace
2430 Palmetto Street, Suite 2
Oakland, CA 94602
tele: 510-530-9616
fax: 510-482-9285
ESI: e.w.wallace@sbcglobal.net
Attorney for Plaintiff, Jody K. George

# UNITED STATES DISTRICT COURT
## FOR THE
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JODY K. GEORGE, ) | Case No. 1:03-cv-06052-DLB |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| JOHN E. POTTER, Postmaster ) | |
| General, U.S. Postal Service, ) | |
| Defendant. ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**DATE:** October 9, 2009
**TIME:** 9:00 a.m.
**CTRM:** 9
**Hon. Dennis L. Beck**

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -i-

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -ii-

I. INTRODUCTION AND SUMMARY OF ARGUMENTS . . . . . . . . . . . . . 1

II. LEGAL STANDARDS OF ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . 7

III. ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    1. Hostile Work Environment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    2. Adverse Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    3. Similarly Situated Employees and the Use of "Me, Too" Evidence . . . 19

    4. USPS asserts George cannot establish
       a *prima facie* case of discrimination
       because his performance was not
       satisfactory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    5. USPS' articulated reasons for its actions . . . . . . . . . . . . . . . . . . . 42

IV. ARGUMENTS ON PRIVACY ACT VIOLATIONS . . . . . . . . . . . . . . . . 58
   AND SPOLIATION

    1. The Merced Files on Jody K. George . . . . . . . . . . . . . . . . . . . . . 58

    2. The DeLeon Files on Jody K. George . . . . . . . . . . . . . . . . . . . . . 58

    3. The Lack of Documentary Evidence to Support USPS' Defenses . . . 59

    4. The DeLeon Files Violate The Privacy Act . . . . . . . . . . . . . . . . . . 61
       But Even If DeLeon's Files Do Not Violate
       The Privacy Act They Were Part of a System
       of Records That Needed to Be Preserved

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alonzo v. Chase Manhattan Bank, N.A.,* . . . . . . . . . . . . . . . . . . . . . . .   10
   25 F.Supp.2d 455  (S.D.N.Y.1998))

*Altschuler v. Samsonite Corp.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34
   109 F.R.D. 353 (E.D.N.Y.,1986)

*Angelone v. Seyfarth Shaw, LLP,* . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7, 8
   Not Reported in F.Supp.2d, 2007 WL 1033458
   (E.D.Cal. April 3, 2007)

*Anheuser-Busch, Inc. v. Natural Beverage Distrib.,* . . . . . . . . . . . . . .   60
   69 F.3d 337, 348 (9th Cir.1995)

*Antonopulos v. Aerojet-General Corp.,* . . . . . . . . . . . . . . . . . . . . . . .   13
   295 F.Supp. 1390 (E.D. Cal. 1968)

*Asmo v. Keane, Inc.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27
   471 F.3d 588  (6th Cir. 2006)

*Board of Trustees of Keene State College v. Sweeney* ["*Sweeney*"], . . . . . . . . .   39
   439 U.S. 24, 99 S.Ct. 295 (1978)

*Broccoli v. Echostar Communications Corp.,* . . . . . . . . . . . . . . . . . . . .   36
   229 F.R.D. 506 (DC MD, 2005)

*Burlington Northern & Sante Fe Railway Co. v. White*  . . . . .   19, 23, 24, 25, 26
   ["*White*"] 548 U.S. 53 (2006)

*Byrnie v. Town of Cromwell, Board of Education,* . . . . . . . . . . . . . . . . . . .   34, 36
   243 F.3d  93 (2nd Cir. 2001)

*Cabinetware Inc. v. Sullivan,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34
   1991 WL 327959 (E.D. Cal 1991)

*Clinton v. California Dept. of Corrections,* . . . . . . . . . . . . . . . . . . . . . .   60
   Slip Copy, 2009 WL 1308984 (E.D.Cal.,2009)

*Cruz v. Coach Stores, Inc.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17-18
   202 F.3d 560 (2d Cir. 2000)

*Davis v. Town of Lake Park, Fla.,* . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
   245 F.3d 1232 (11th Cir. 2001)

*Deravin v. Kerik,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10, 11
   335 F.3d 195 (2nd Cir. 2003)

*EEOC v. HBE Corp.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18
   135 F.3d 543 (8th Cir. 1998)

*EEOC v. Navy Federal Credit Union,* . . . . . . . . . . . . . . . . . . . . . . . . .   18
   424 F.3d 397 (4th Cir. 2005)

Plaintiff's Points & Authorities In Opposition
To Defendant's Motion for Summary Judgment     -ii-     *George v. Potter, Postmaster General*
   **Case No. 1:03-cv-06052-DLB**

*EEOC v. Commercial Office Products Co.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    486 U.S. 107 (1988);

*Estelle v. Gamble,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    429 U.S. 97 (1976)

*Faragher v. City of Boca Raton,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    524 U.S. 775 (1998)

*Favors v. Fisher,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    13 F.3d 1235 (8th Cir. 1994)

*Federal Deposit Ins. Corp. v. Dye,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
    642 F.2d 833 (5th Cir. 1981)

*Federal Exp. Corp. v. Holowecki,* . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10
    128 S.Ct. 1147  (2008)

*Forkkio v. Powell,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    306 F.3d 1127 (D.C. Cir. 2002)

*Furnco Construction Corp. v. Waters,* . . . . . . . . . . . . . . . . . . . . . . . . . 39
    438 U.S. 567 (1978)

*Goldsmith v. Bagby Elevator Co.,* . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 31
    513 F.3d 1261 (11th Cir. 2008)

*Hackett v. McGuire Bros., Inc.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    445 F.2d 442 (3rd Cir. 1971)

*Harper v. U. S.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61-62
    423 F. Supp. 192 (D.C. S.C. 1976)

*Harris v. Forklift Sys., Inc.,* . . . . . . . . . . . . . . . . . . . . . 6, 11, 12, 13, 19
    510 U.S. 17 (1993)

*Heyne v. Caruso,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    69 F.3d 1475 (9th Cir.1995)

*Hicks v. Gates Rubber Co.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    833 F.2d 1406 (10th Cir. 1987)

*Hishon v. King & Spalding,* . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22
    467 U.S. 69 (1984)

*Int'l. Bhd. of Teamsters v. United States,* . . . . . . . . . . . . . . . . . . . . . . 27
    431 U.S. 324 (1977)

*Johnson v. Palma,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 42
    931 F.2d 203 (2nd Cir. 1991)

*King v. Califano,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
    471 F.Supp. 180 (D.D.C. 1979)

*King v. Georgia Power Co.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    295 F.Supp. 943 (N.D. Ga. 1968)

*Kortan v. Cal. Youth Auth.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    217 F.3d 1104 (9th Cir. 2000)

*Kronisch v. United States,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
    150 F.3d 112 (2nd Cir.1998)

*Laughlin v. Metro. Wash. Airports Auth.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    149 F.3d 253 (4th Cir. 1998)

*Leon v. IDX Systems Corp.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
    464 F.3d 951 (9th Cir.2006)

*Mathirampuzha v. Potter,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11
    548 F.3d 70  (2nd Cir. 2008)

*Mattenson v. Baxter Healthcare Corp.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    438 F.3d 763 (7th Cir. 2006).

*McDonnell Douglas Corp. v. Green,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    411 U.S. 792 (1973)

*Meacham v. Knolls Atomic Power Laboratory,* . . . . . . . . . . . . . . . . . . . . 20
    128 S.Ct. 2395 (2008)

*Meritor Sav. Bank, FSB v. Vinson,* . . . . . . . . . . . . . . . . . . . . . 6, 12, 19, 22, 23
    477 U.S. 57 (1986)

*Metropolitan Opera Ass'n. v. Local 100, Hotel Employees,* . . . . . . . . . 34, 35, 36
    212 F.R.D. 178 (S.D. N.Y.  2003)

*National Association of Radiation Survivors v. Turnage,* . . . . . . . . . . . . . . . 34
    115 F.R.D. 543 (N.D.Cal.1987)

*National Hockey League v.Metropolitan Hockey Club, Inc.* . . . . . . . . . . . . . . 34
    427 U.S. 639 (1976)

*National R.R. Passenger Corp. v. Morgan* ["*Morgan*"], . . . . . . . . . . . . . . . . . 12
    536 U.S. 101 (2002)

*Oscar Mayer & Co. v. Evans,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    441 U.S. 750 (1979)

*Oubichon v. North American Rockwell Corp.,* . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    482 F.2d 569 (9th Cir.1973)

Penthouse Intern., Ltd. v. Playboy Enterprises, Inc.  . . . . . . . . . . . . . . . . . . 34
    663 F.2d 371 (C.A.N.Y., 1981)

*Pilon v. U.S. Dept. of Justice,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
    73 F.3d 1111 (D.C. Cir. 1996)

*Reilly v. Natwest Markets Group, Inc.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    181 F.3d 253  (2d Cir.1999)

*Residential Funding Corp. v. Degeorge Financial Corp.* . . . . . . . . . . . . . . . 34
    306 F.3d 99 (2nd Cir. 2002)

*Ritchie v. United States,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
   451 F.3d 1019 (9th Cir.2006)

*Sanchez v. Standard Brands,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   431 F.2d 455 (5th Cir. 1970)

*Silvestri v. Gen. Motors Corp.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
   271 F.3d 583 (4th Cir.2001)

*Sprint/United Management Co. v. Mendelsohn* ["*Mendelsohn*"] . . 28, 29, 30, 31
   128 S.Ct. 1140 (2008)

*St. Mary's Honor Center v. Hicks,* . . . . . . . . . . . . . . . . . . . . . . . 40, 41, 42, 43
   509 U.S. 502 (1993)

*Stoll v. Runyon,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7
   165 F.3d 1238 (9th Cir.1999).

*Sumner v. United States Postal Serv.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
   899 F.2d 203 (2d Cir. 1990)

*Tarlton v. Cumberland County Correctional Facility,* . . . . . . . . . . . . . . . . . . 35
   192 F.R.D. 165 (D.N.J.2000)

*Teamsters v. United States,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
   431 U.S. 324 (1977)

*TeleVideo Sys., Inc. v. Heidenthal,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
   826 F.2d 915 (9th Cir.1987)

*Texas Dept. of Community Affairs v. Burdine,* . . . . . . . . . . . . . . . . . 39, 40, 43
   450 U.S. 248 (1981)

*Tijerina v. Walters,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
   821 F.2d 789 (D.C.Cir.1987)

*Trafficante v. Metropolitan Life Ins. Co.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   409 U.S. 205 (1972)

*Turner v. Hudson Transit Lines, Inc.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
   142 F.R.D. 68  (S.D.N.Y.1991)

*Velazequez-Garcia v. Horizon Lines of P.R., Inc.,* . . . . . . . . . . . . . . . . . . . . 27
   473 F.3d 11 (1st Cir. 1979)

*Wedow v. City of Kansas City, Mo.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
   442 F.3d 661

*Whigum v. Keller Cresent,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   260 Fed.Appx. 910 (7th Cir.  2008).

*Wiley v. Glassman,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26
   511 F.3d 151 (D.C. Cir. 2007)

*Williams v. New York City Hous. Auth.,* . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11
   458 F.3d 67 (2d Cir.2006)

*Zamora v. Sacramento Rendering Co.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   Not Reported in F.Supp.2d, 2007 WL 137239
   (E.D. Cal. 2007)

*Zubulake* ["*Zubulake IV*"] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36
   220 F.R.D. 212 (S.D.N.Y. 2003)

*Zubulake v. USB Warburg, LLC,* ["*Zubulake V*"], . . . . . . . . . . . . . . . . 35, 36
   229 F.R.D. 422, 2004 WL 1620866 (SD NY 2004)

*Zubalake v. UBS Warburg, LLC,* . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 36
   382 F.Supp.2d. 536 (S.D.N.Y.2005)

## EEOC DECISIONS

*Carroll v. Department of the Army,* . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   EEOC Request No. 05970939 (April 4, 2000)

*McMillen v. Potter,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   2009 WL 591025 (26 February 2009)

*Smith v. Potter,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   2009 WL1117619 (15 April 2009)

## FEDERAL STATUTES

5 U.S.C. § 552a(b)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

5 U.S.C. § 552a(b)(3)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

5 U.S.C. § 552a(j)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

29 U.S.C. §§ 621-34 (2000)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 U.S.C. § 2000e-2(a) (2000) (Title VII § 703(a))   . . . . . . . . . . 1, 8, 13, 15, 21

42 U.S.C. § 2000e-2(m)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 U.S.C. § 2000e-3(a) (2000) (Title VII § 704(a))   . . . . . . . . 1, 8, 13, 16, 23, 24

42 U.S.C. § 2000e-5   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# FEDERAL REGULATIONS

29 C.F.R. § 1602.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

29 C.F.R. 1613.222 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

29 CFR Part 1614 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

29 C.F.R. § 1614.105(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

29 C.F.R. § 1614.605(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5

# FEDERAL RULES

Federal Rules of Civil Procedure

    Rule 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    Rule 37(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

    Rule 50(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42

    Rule 52(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42

    Rule 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Federal Rules of Evidence

    Rule 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

    Rule 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

# FEDERAL AGENCY MANUALS

EEOC Compliance Manual Section 8, . . . . . . . . . . . . . . . . . . . . 26
    "Retaliation," No. 915.003 (May 20, 1998)

## POSTAL MANUALS AND PUBLICATIONS

Administrative Support Manual (ASM) 11 (March 1996) . . . . . . . . . . . . . . . 38

Employee and Labor Relations Manual Issue 12 (5-1-1989) . . . . . . . 37, 38, 59

Employee and Labor Relations Manual Issue 13 (June 1998) . . . . . . 37, 38, 59

Management Instruction AS-840-2003-3 . . . . . . . . . . . . . . . . . . . . . . . 37
    (Electronic Messaging (e-mail)) AS-870-2005-2

# PUBLICATIONS

–, –.   <u>Black's Law Dictionary</u>, 7th ed.,   . . . . . . . . . . . . . . . . . . . . . . . . . . .   41
West Group, St. Paul, Mn. 1999

Coleman, Brady, <u>Pragmatism's Insult:</u>   . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
<u>The Growing Interdisciplinary Challenge</u>
<u>to American Harassment Jurisprudence,</u>
8 Emp. Rts. & Emp. Pol'y J. 239, 242 (2004)

Jellum, Linda D.& David Charles Hricik,   . . . . . . . . . . . . . . . . . . . . . . . . .   25
<u>Modern Statutory Interpretation:</u>
<u>Problems, Theories, and Lawyering Strategies</u> (2006).

Kilborn, Peter T., "Backlog of Cases Is   . . . . . . . . . . . . . . . . . . . . . . . . . . .   17
Overwhelming Jobs-Bias Agency,"
N.Y. Times, Nov. 26, 1994, at 10.

Krieger, Linda Hamilton,   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
<u>Afterword: Socio-Legal Backlash,</u>
21 Berkeley J. Emp. & Lab. L. 476 (2000).

Larkin, Dorothy E., Note, <u>Participation Anxiety:</u>   . . . . . . . . . . . . . . . . . . . . .   17
<u>Should Title VII's Participation Clause Protect</u>
<u>Employees Participating in Internal Investigations,</u>
33 Ga. L. Rev. 1181, 1191 (1999)

Lawton, Anne, <u>The Bad Apple Theory in</u>   . . . . . . . . . . . . . . . . . . . . . . . . . .   17
<u>Sexual Harassment Law,</u>
13 Geo. Mason L. Rev. 817, 838 (2006)

Nielsen, Laura Beth & Aaron Beim,   . . . . . . . . . . . . . . . . . . . . . . . . . . .   16, 17
<u>Media Misrepresentation: Title VII, Print Media, and</u>
<u>Public Perceptions of Discrimination Litigation,</u>
15 Stan. L. & Pol'y Rev. 237 (2004)

Quinn, Beth A. <u>The Paradox of Complaining:</u>   . . . . . . . . . . . . . . . . . . . . .   16
<u>Law, Humor, and Harassment in the Everyday Work World,</u>
25 Law & Soc. Inquiry 1151 (2000)

Turner, Ronald, <u>A Look at Title VII's Regulatory Regime,</u>   . . . . . . . . . . . .   16, 17
16 W. New Eng. L. Rev. 219, 470-71 (1994)

Yelnosky, Michael J., <u>Title VII, Mediation, and Collective Action,</u>   . . . . . . . .   16
1999 U. Ill. L. Rev. 583

## I.   INTRODUCTION AND SUMMARY OF ARGUMENTS

While a squib in an annotated code book presents an abbreviated legal "concept" about meaning of the code, it often ignores the specific facts of the squibbed case that actually provide case specific exclusions from or exceptions to the legal analysis stated in the squib.  Likewise, Defendant ["USPS"] in its motion for summary judgment presents generic law, but has selectively excluded from its motion numerous undisputed material facts and material facts genuinely in dispute in this case – which facts show USPS is not entitled to summary judgment in its favor.  However, since the issue of summary judgment is before the Court, these undisputed material facts support partial summary judgment in favor of Plaintiff ["George"]. [1]

The primary claim of George's administrative cases is that his supervisors and other local Merced management officials retaliated against him through various action undertaken because he engaged in activities protected under Title VII [42 U.S.C. § 2000e-3(a); § 704(a) of the Civil Rights Act of 1964, as amended (the Act)], though these same management actions also form the basis of his claims of discrimination prohibited by Title VII [42 U.S.C. § 2000e-2(a); § 703(a) of the Act].  The retaliation took the form of abuse and harassment directly linked to each individual act of retaliation because virtually each act and omission occurred – much more than coincidentally on the very same day or the next day or so – after George requested official time [2] to work on a pending administrative EEO case,  or after they found out about new EEO claims against them.  Those involved with the taking of these retaliatory actions were usually his supervisors or other local management officials named in pending EEO administrative case(s) that triggered George's request for

---

[1]     Judgment for the non-movant is appropriate if entitled to judgment as a matter of law.  *Stoll v. Runyon*, 165 F.3d 1238, fn 1 (9th Cir.1999).

[2]     29 C.F.R. § 1614.605(b) provides: "If the complainant is an employee of the agency, he or she shall have a reasonable amount of official time, if otherwise on duty, to prepare the complaint and to respond to agency and EEOC requests for information. *** "

1  official time and their the retaliatory acts, although at times others involved were the

2  "cat's paw" for such named management officials.

3          USPS' motion does not address George's separate claim of violations of the

4  Privacy Act discussed below.

5          USPS' motion unfairly maligns George.  It repeats the claims of those local

6  officials George named as being responsible for the alleged Title VII violations, by

7  "characterized him as performing in the bottom 25% of carriers in the Merced Post

8  Office because of his inefficient mail-handling and time-wasting practices." It ignores

9  the fact that during the relevant years (1996-2001), as a T-6 carrier technician, George

10  had greater responsibilities and duties than ordinary Merced carriers. Compare the T-

11  6's duties with those of an ordinary PS-5 carrier. **Wallace Dec. Exhibit 10**.

12          USPS has not explained why local management repeatedly initiated actions

13  against George for his use of street time and office time, when his use of time was

14  consistent the normal evaluated route times for such deliveries adjusted by the volume

15  of mail he had to deliver.  That is the standard is used throughout the postal system,

16  yet, for example, on 21 March 2001, George had mail rated at 3:44 hours of street

17  time for delivery, his supervisor gave him less than 1 hour to deliver it, then when

18  George completed that delivery in 3:26 hours (18 minutes less time than it was rated

19  for), he was charged with using "1.31 hours of unauthorized overtime and an

20  additional 2 hours and 5 minutes of unauthorized time." That is the first issue of the

21  9 April 2001 proposed removal (in Case 7).  See Statement of Facts No. 4.

22          USPS has not explained why local management set up for George an arbitrary

23  system of return times impossible to meet, that radically foreshortened the normal

24  evaluated time necessary for any carrier to complete such deliveries, then disciplined

25  him when he met the normal evaluated times and complied with the postal rule to

26  complete deliveries and not bring back deliverable mail from the street.

27          USPS has not explained that if local Merced management considered George

28  as one of the worst employees they ever had, then why did local management keep

George in the more responsible and higher grade (grade PS-6) T-6 Carrier Technician position, where he served as the principle carrier cleaning-up for a group of lower grade City Letter Carriers [grade PS-5].  If he was so bad, they have not explained why they kept him as a full time Postal carrier (in grades PS-5 and PS-6) in Merced for over 15 years from his start in 1985 until they removed him in 2001.

The reality in Merced during the relevant period (1996-2001) was that extensive growth caused by new home construction and other development routinely caused routes to have many more deliveries than previously determined in postal evaluations, and, at various relevant times, one or more of the regular carriers assigned to a route within George's group was off work for an extended period of time.  That meant that a variety of part-time flexible carriers unfamiliar with the route(s) delivered them on the days George did not.

In essence, much of the detailed route work [such as delivery of accountable mail (including getting mail signed by the postal customer), vacation holds, change of addresses and noting route changes] and mail not delivered on previous days was left for George to do.  That way those unfamiliar with the routes sluffed off this necessary work to George in order that they could complete a route within the time allotted them by local management.  If Merced postal management has a reason to do so, this practice was ripe for discrimination and reprisal against a T-6 Carrier for his use of time to complete his duties.

Each day a supervisor would meet with each carrier, including George, to get the carriers' estimated time needed for the day, including for auxiliary assistance and overtime. [3]  While the supervisors assert they daily negotiate with the carriers over

---

[3]        Daily the carriers complete a PS Form 3996 [Carrier - Auxiliary Control] indicating their estimates of the time needed to complete the route that day based on the volume of mail and what overtime and/or auxiliary assistance (having another carrier take part of their office duties and/or street duties).  The supervisor would then come around to each carrier and approve and/or disapprove any extra time or assistance the carrier indicated was needed on the "3996."  If auxiliary assistance was provided, the auxiliary carrier was to note what they did and how much time was used to do it on the 3996.

these estimates, with George, generally the supervisors arbitrarily reduced his estimates, then held him to the reduced time or some other arbitrary time they gave him. [4] What is consistent throughout George's administrative cases is that supervisors meet daily with each of their subordinate carriers to go over that carrier's estimates of time needed to complete the route that day, including the carrier's estimates of what auxiliary assistance and overtime may be needed. The motivations for and actions of the supervisors in response to George's estimates are at issue. [5] Local management repeatedly asserts George, as well as the other carriers, know how to estimate the time they need for auxiliary assistance and overtime and that the carriers have been trained in how to make such estimates, and, by implication, that supervisors also know how to adjust such estimates. Virtually all information relating to estimates is in USPS' exclusive possession and control, and, though requested in discovery, it has not been provided.[6]

---

[4]      Though requested in discovery, USPS has provided very little of the information exclusively in the possession of USPS and unavailable to plaintiff. For example, USPS has not produced more than an inkling of information that George sought administratively and in this court action that concerns carrier estimates, training provided carriers (including George) in how to make or evaluate estimates, how supervisors determine what time or assistance to allow or disallow, normal delivery times for routes, daily volumes of mail, and information about what other carriers used for office and street time, carrier requests for auxiliary assistance and overtime, what Merced supervisors allowed or disallowed others. Much of the carrier daily estimates and time allotted by management to them would be shown on PS Forms 3996 [Carrier - Auxiliary Control]. USPS has failed to produce specific forms George used that relate to facts in issue before this Court.

[5]      For example, evidence in "Case 7" [the 2001 removal] shows union grievance statements of carriers prepared shortly after George was placed on emergency leave on 26 March 2001, which show the manner in which supervisors' arbitrarily treat carriers and their time estimates. U.S. 0005633-35.

[6]      For example, though requested, USPS has not produced the PS Forms 3996 [Carrier - Auxiliary Control] forms and related documentation of other carriers for the relevant periods of this case. Such documentation would show how George's use of time was not excessive compared to other carriers, the supervisors' arbitrariness in allotting time to George, the mail volumes, whether the delivery times of route evaluations were current and in adjustment, route work loads and what auxiliary assistance and overtime had been provided, and supervisor response to other carriers' requests. USPS has provided a very limited sample of some related documents, for example, a few dated in 1997, which include: PS Form 3930 (Weekly Operations Analysis Delivery Services) U.S. 0007318;  Workhour/Workload - All Routes reports (showing the hours and volumes of mail handled on routes on a daily, weekly or other basis) U.S. 0007319-20;  Daily Delivery Unit Volume Reports [detailing the volume of mail handled daily by route] U.S. 0007321-22;  Daily Route reports

(continued...)

On 22 March 2001, the next day after the first of two incidents cited in the 9 April 2001 proposed removal, George's supervisor gave him an investigative interview on "excessive use of street time" the day before.  The supervisor would not let George talk to his union steward outside the presence of that supervisor, then when George protested, the supervisor immediately gave George another investigative interview for protesting.  Statement of Facts No. 4.  When George got home that day, he found a 19 March 2001 request from an EEOC Administrative Judge concerning 4 cases that needed his response.  On 23 March 2001, he requested official time to work on those cases and, because of the workload on his route that day, 1:05 hours of auxiliary assistance.  The supervisor denied both and specifically noted, "NO EEO Time."  *Id*.  While USPS articulates numerous reasons for its actions, it has never explained why George was completely denied "EEO Time" in violation of 29 C.F.R. § 1614.605(b).

The incident with supervisor Ryan Anderson occurred the next day, 24 March 2009.  That is the second of the two incidents charged in the 9 April 2001 proposed removal.  Both George's and Anderson's versions of what happened appear in Statement of Facts No. 4.  What is clear is that Anderson, while sitting at the supervisor's desk, told George he was writing him up for excessive use of time and that George wanted a PS Form 3996 to document it.  George was concerned about management's past practices with regard to claims of excessive use of time, and he had his reply to the EEOC's administrative judge's request on his mind and pressing him.  Anderson repeatedly refused to give George a form, although Anderson admits the forms are routinely kept at the supervisor's desk where he was sitting.  Anderson also admits, that another employee was present in the post office at the time and that this other employee routinely remains there after he leaves.  Other than Anderson's

⁶(...continued)
(showing the time carriers used by function on a route) U.S. 0007323.  Some additional PS Forms 3996 have been provided for 1999.  This information is routinely (often daily) prepared by and readily available to local postal management but was not disclosed.

arbitrariness in deciding George could not remain, nothing prevented Anderson from giving George the form and letting him complete it until the other employee clocked off. Instead, the second incident of the proposed removal occurred. See the descriptions by both George and Anderson as to what took place at Statement of Facts No. 4.

USPS leaves out of its motion material undisputed facts and material facts in dispute in each case. As an example, compare USPS' description under "Case 2 – 1997 street observation and lifting technique instruction (USPS Claim No. 4F-956-0177-97)," beginning at USPS' P&As, middle of page 5, with the description of the circumstances involved as shown in Statement of Facts No. 5.

What is clear is that after George requested official time to work on an EEO case on 9 July 1997, the stress management created during this three day incident (9-11 July 1997) caused George to be placed off work by his doctor and caused George to incur monetary losses. *Id.*

In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993), the Court stated:

> Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, *Meritor, supra,* 477 U.S., at 67, 106 S.Ct., at 2405, there is no need for it also to be psychologically injurious.

Local management has not explained why the complained about actions did not occur when George had not just made a request for official time or had an EEO paper immediately due. They also did not explain that circumstances of many incidents include management engaging in various acts in violation of Postal policies (such as here where the supervisor made intentional vehicle safety violations to go ostracize George on 9 June 1997), nor did they explain that in their inconsistent application of Postal policies they treated George less favorably than similarly situated peers not of his protected status (such as giving George three investigative interviews on 10 & 11 June 1997 concerning 9 June 1997).

This conflict between USPS' so-called "legitimate non-discriminatory and non-

retaliatory reasons" for its actions and the actual timing and full circumstance of these actions, along with the inconsistent and violative application of internal Postal policies, at a minimum, may turn this case into a "mixed motive" one (where both a legitimate and a prohibited retaliatory reason are present) for the actions.  42 U.S.C. § 2000e-2(m).  Regardless, with the conflicting evidence, management's credibility is at issue.  A finder of fact could, and more likely would, find that USPS' articulated reasons for its actions are pretextual.  Summary judgment for USPS is inappropriate.

The gist of USPS' motion are assertions that (1) George failed to exhaust administrative remedies as to the hostile work environment claim, (2) he did not suffer an adverse action, (3) no showing of similarly situated employees treated more favorably, (4) he cannot establish prima facie case of discrimination because his performance was not satisfactory, and (5) USPS has articulated a legitimate non-discriminatory reason for its actions.  We address each below.

## II.   LEGAL STANDARDS OF ANALYSIS

Summary judgment should be rendered "if the pleading, the discovery and disclosure material on file, and any affidavits shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56 (c), Federal Rules of Civil Procedure.  Likewise judgment for the non-movant is appropriate if entitled to judgment as a matter of law.  *Stoll v. Runyon*, 165 F.3d 1238, fn 1 (9th Cir.1999).

## III.   ARGUMENTS

1.   <u>Hostile Work Environment Claim</u>

In *Angelone v. Seyfarth Shaw, LLP*, Not Reported in F.Supp.2d, 2007 WL 1033458 (E.D.Cal. April 3, 2007), U.S. District Judge, Frank C. Damrell, Jr., found that plaintiff's EEOC claim was based solely on acts of disability discrimination and reprisal under the Americans with Disability Act [ADA] and, for the first time in federal court, plaintiff sought to include an allegation based on a prior, unrelated act of age discrimination under the Age Discrimination in Employment Act [ADEA].  In

ruling on defendant's motion for summary judgment, Judge Frank C. Damrell, Jr., stated a long established principle of discrimination law:

> A plaintiff may litigate incidents not listed in the original administrative complaint only if the acts are of "discrimination like or reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC." *Oubichon v. North American Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir.1973).

After noting that plaintiff conceded that her ADEA claim was not based upon the same discriminatory act complained of in her EEOC claim but on a prior unrelated act, Judge Damrell found that the unrelated "event is not raised at all in plaintiff's EEOC complaint. Her failure to file an EEOC complaint asserting her age discrimination claim bars her from litigating such a claim under the ADEA." *Angelone*, *supra*, 2007 WL 1033458 at *16.

USPS misconstrues the meaning of a basis of a claim. Under the ADEA, the basis is "age." Under the ADA, the basis is "disability." Under Title VII, the permitted bases are "race, color, religion, sex, or national origin" [42 U.S.C. § 2000e-2(a)] and retaliation "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" [42 U.S.C. § 2000e-3(a)]. George's claims are brought under Title VII.

The mandatory Postal form for filing an EEO Complaint has boxes to check for the bases cited in the statutes. U.S. 0007253. The Postal form does not provide the *pro se* filer with a block for "hostile work environment," let alone provide the filer with information about a hostile work environment.

As required in the administrative process, all of George's administrative cases were first brought to a USPS EEO counselor. 29 C.F.R. § 1614.105(a). From October 1992 to 9 November 1999, the EEOC required all EEO counselors to " Determine the issue(s) and basis(es) of the potential complaint" [EEO MD-110 (10/92), Chapter 2, I.2 (page 2-2)], and thereafter, to "Determine the claim(s) and basis(es) raised by the

potential complaint" [EEO MD-110 (9 Nov. 1999), Chapter 2, III.2 (page 2-4)].

**Wallace Dec Exhibit 7**.  Knowing the volume of George's EEO cases (which increased with each counseling requests as a basis for his claim of retaliation), the repetition of issues and the interrelationship of the alleged retaliation from case to case, the EEO counselors were obligated to determine if George's *pro se* cases involved an potential claim of a "hostile work environment."  Nothing in the record indicates that any USPS' EEO counselor ever advised the *pro se* George as to the meaning of a "hostile work environment."

USPS' EEO counselors and USPS' subsequent actions, in relationship to George's administrative *pro se* status, are not consistent with the Court's holding in *Federal Exp. Corp. v. Holowecki*, 128 S.Ct. 1147 (2008), stated:

> It is true that under this permissive standard a wide range of documents might be classified as charges.  But this result is consistent with the design and purpose of the ADEA.  Even in the formal litigation context, *pro se* litigants are held to a lesser pleading standard than other parties.  See *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (*Pro se* pleadings are to be "liberally construed").  In the administrative context now before us it appears *pro se* filings may be the rule, not the exception.  The ADEA, **like Title VII, sets up a "remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process.**"  *EEOC v. Commercial Office Products Co.,* 486 U.S. 107, 124, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988); see also *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 756, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979) (noting the "common purpose" of Title VII and the ADEA).  The system must be accessible to individuals who have no detailed knowledge of the relevant statutory mechanisms and agency processes.  It thus is consistent with the purposes of the Act that a charge can be a form, easy to complete, or an informal document, easy to draft.  The agency's proposed test implements these purposes.

*Holowecki*, 128 S.Ct. At 1158 [emphasis added].

USPS' motion asserts each of George's administrative complaints must be considered separately.

However, in citing to *Mathirampuzha v. Potter*, 548 F.3d 70, 77 (2nd Cir. 2008) and other cases for the proposition that George's hostile environment claim must be excluded, USPS does concede that "'new claims are "like or reasonably related" to the allegations contained in the EEOC" charge"'" are permitted, and "[t]his includes allegations concerning hostile work environment claims." Doc. 67, at 22 of 33 [USPS

page 16] at lines 20-23.

George's complaints have not been handled separately, but in many instances consolidated at various times of the administrative process. With repeated allegations postal actions over George's purported use of "excessive time," "failure to follow instructions" and ongoing claims that George was one of the worst employees in Merced; the question of a hostile work environment was put squarely before USPS, even if it chose not to inform George of its potentiality as its EEO counselor was obligated to do. Further George has not claimed only one, single isolated event, but has issues covering the full gambit of time from 1996 through 2001. The volume alone put USPS on notice of the interrelationship of their issues.

The question of the validity of George's hostile work environment claim is actually supported by *Mathirampuzha*, in which the Second Circuit stated:

> We do not think that the plaintiff's allegation of a single incident of aggression by Sacco could reasonably be expected to blossom into an investigation covering allegations of unrelated misconduct by Sacco dating back several years.

> We reach this conclusion bearing in mind that the "reasonably related" inquiry requires a fact-intensive analysis. "In determining whether claims are reasonably related, the focus should be on the factual allegations made in the [EEO] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Deravin*, 335 F.3d at 201 (citation and internal quotation marks omitted). "[I]t is the substance of the charge and not its label that controls." *Id.* (quoting *Alonzo v. Chase Manhattan Bank, N.A.*, 25 F.Supp.2d 455, 458 (S.D.N.Y.1998)). "The central question is whether the complaint filed with the [EEO] gave th[e] agency adequate notice to investigate discrimination on both bases." *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir.2006) (per curiam) (citations and internal quotation marks omitted).[FN6]

> FN6.   We have said that the "reasonably related" doctrine "is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims he is suffering." *Deravin*, 335 F.3d at 201 (citation, internal quotation marks, and brackets omitted); *cf. Fed. Express Corp. v. Holowecki*, --- U.S. ----, 128 S.Ct. 1147, 1160, 170 L.Ed.2d 10 (2008) ("Documents filed by an employee with the EEOC should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies.").

> We frequently invoke the "reasonably related" doctrine when the factual allegations made in the administrative complaint can be fairly read to encompass the claims ultimately pleaded in a civil action or to have placed the employer on notice that such claims might be raised. For example, in *Deravin*, we concluded that the plaintiff's race discrimination claim was reasonably related to his EEOC charge of national-origin discrimination because, "read liberally, allegations by an African-American employee that employees of Irish descent are receiving preferential treatment implicitly suggests some form of potential racial

discrimination in addition to an illegitimate preference premised on national origin." *Deravin*, 335 F.3d at 202. Similarly, in *Williams*, we decided that an EEOC charge alleging retaliation was "reasonably related" to a later-articulated claim of sex discrimination because the detailed narrative of the EEOC charge unmistakably referred to sexual harassment: "[B]ecause the factual underpinnings of a gender discrimination claim were presented in the complaint made to the EEOC, it was error to dismiss [plaintiff's] claim for failure to exhaust her administrative remedies." *Williams*, 458 F.3d at 71. Here, by contrast, the plaintiff's EEO filing did not give the Postal Service "adequate notice," *id.* at 70 (citation and internal quotation marks omitted), nor did it contain the "factual underpinnings," *id.* at 71, of a hostile work environment or retaliation claim.

548 F.3d at 76-77. Administratively, George did not claim only one act occurred during 1996-2001, but his numerous claims (USPS acknowledges some 25 EEO cases over 5 ½ years) provide the factual underpinnings for his claim of a hostile work environment.

In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25-26 (1993), Ginsberg, J. concurring, states:

> the adjudicator's inquiry [into activity creating a hostile or abusive work environment] should center, dominantly, on whether the discriminatory conduct has unreasonably interfered with the plaintiff's work performance. To show such interference, "the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment." [cite omit.] It suffices to prove that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to "ma[k]e it more difficult to do the job." [cite. omit].

All of George's administrative claims are of management "conduct [that] has unreasonably interfered with the plaintiff's work performance." *Harris, supra.* Whether the conduct did or did not interfere with plaintiff's work performance is a question of fact, but such interference is alleged in each administrative case. George's allegations also encompass local management's actions that "so altered working conditions as to "ma[k]e it more difficult to do the job." For example, holding George to time standards on routes that were shorter than the normal evaluated times for such routes; arbitrarily setting a return time that did not let George complete a route within the normal established times; then holding investigative interviews, issuing discipline and other actions because he did not meet the specific higher -standards they demand of him above the normal established standards. For example, telling George to complete over three hours of rated street delivery time in less than one hour altered

his working conditions, making it not only "difficult" to do the job, but impossible.

The allegations of George's individual cases meet Justice Ginsberg's standards for a "hostile work environment," even if he did not use those "magic words."

USPS cannot deny knowledge of George's repeated claims in response to local management's repeated charges (such as made in the numerous letters of warning, letters of suspension, and ultimate removal) that George "failed to follow instructions," used "excessive time," and was at the bottom of employee's working in Merced.

Further, USPS's motion, and its prior argument administratively over the years, is that most of George's issues do not individually rise to the level of an actionable claim. Whether such assertions are true or not, in making them, USPS acknowledges the distinction between a discrete act and acts contributing to a hostile work environment. *National Railroad Passenger Corporation v. Morgan,* 536 U.S. 101 (2002) ("'Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. [*cite omit.*] The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. [*cite omit.*] Such claims are based on the cumulative effect of individual acts.'" *Meritor,* at 115.).

In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 24-25 (1993), then Justice, now Chief Justice Scalla, concurring, states:

> One of the factors mentioned in the Court's nonexhaustive list-whether the conduct unreasonablyinterferes with an employee's work performance-would, if it were made an absolute test, provide greater guidance to juries and employers. But I see no basis for such a limitation in the language of the statute. Accepting *Meritor*'s interpretation of the term "conditions of employment" as the law, the test is not whether work has been impaired, but whether working conditions have been discriminatorily altered. I know of no test more faithful to the inherently vague statutory language than the one the Court today adopts. For these reasons, I join the opinion of the Court.

Again, the administrative Formal Complaint form provided by USPS, and filed *pro se* in each of George's EEO cases , did not have a box to check for a "hostile work

environment," nor provided anything concerning a "hostile work environment" theory of his case.

In *Sanchez v. Standard Brands,* 431 F.2d 455, 463-64 (5th Cir. 1970), "'the plaintiff had checked only the box labeled "sex" and in her judicial complaint alleged discrimination because of her "national origin." '" The Fifth Circuit "decline[d] to hold that the failure to place a check mark in the correct box is a fatal error." *Sanchez*, at 462-464 ("In the context of Title VII, no one not even the unschooled should be boxed out," at 463). The *Sanchez* Court, cited to former Chief Judge MacBride of the Eastern District of California and others for support:

> We must ever be mindful that the provisions of Title VII were not designed for the sophisticated or the cognoscenti, but to protect equality of opportunity among all employees and prospective employees. This protection must be extended to even the most unlettered and unsophisticated. It cannot be doubted that 'a large number of the charges filed with (the) EEOC are filed by ordinary people unschooled in the technicalities of the law.' *King v. Georgia Power Co.*, N.D. Ga. 1968, 295 F.Supp. 943, 947. This fact can only point us in the direction of liberal procedural rules. As Judge MacBride of the Eastern District of California wrote in a Title VII case:

>> 'We are not dealing with businessmen-plaintiffs or plaintiffs accustomed to consulting lawyers about their rights. This law is a remedial one, and the Congressional purpose would not be furthered by making plaintiffs of the kind with which we are concerned, members of the working class who are generally without substantial higher education, dot every 'i' and cross every 't' on their way to the courthouse.' *Antonopulos v. Aerojet-General Corp.*, E.D. Cal. 1968, 295 F.Supp. 1390, 1395.

> It goes without saying, of course, that it is irrelevant whether Celia Sanchez is educated or uneducated. The point is that some charging parties are uneducated and inarticulate, and the procedural rules we develop in this case and in others must be sufficiently liberal to protect their rights. Consequently, we decline to hold that the failure to place a check mark in the correct box is a fatal error. In the context of Title VII, no one- not even the unschooled- should be boxed out.

*Sanchez*, 431 F.2d, at 463.

USPS has been on ongoing notice that in each of his cases, George has been claiming that postal "conduct unreasonably interferes with [his] work performance," Chief Justice Scalla's non-exclusive test for a hostile work environment, *Harris, supra.* In his cases, George has cited as the basis for such discriminatory and retaliatory action those basis stated in Title VII (42 U.S.C. §§ 2000e-2(a) and 3(a)).

2.   <u>Adverse Action</u>

USPS' definition of an adverse employment action is erroneously.  It ignores George's repeated claims of actions by the same management officials, and is inconsistent with existing precedent, policy and intent by ignoring the depth and breathe of employment interaction and by defining such actions far too narrowly.

In a hostile work environment context, such as in with the case USPS cited in its motion, *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104 (9th Cir. 2000), in *Zamora v. Sacramento Rendering Co.*, Not Reported in F.Supp.2d, 2007 WL 137239 * 3 (E.D. Cal. 2007), U.S. District Judge, David, F. Levi, stated:

> Defendants argue that Lehmann's alleged harassing acts were "vague, sporadic, isolated and trivial," and therefore insufficiently severe or pervasive to create a hostile work environment.  They cite a number of cases in which federal and California courts have found workplace conduct to be insufficiently severe or pervasive to create a hostile work environment.  None of these cases, however, involved conduct as severe and pervasive as that which Zamora alleges here.  For instance, in *Kortan v. Calif. Youth Auth.*, the Ninth Circuit held that a supervisor's largely isolated flurry of misogynistic comments was insufficient to create an objectively hostile work environment.  217 F.3d 1104, 1108-10 (9th Cir.2000).  In so holding, the court emphasized that the defendant's comments were made mainly on a single day and were not directed at the plaintiff.  *Id.* at 1110.  In contrast, Zamora alleges that Lehmann consistently engaged in sexual misconduct aimed directly at her for nearly two years.

George's cases allege misconduct directed specifically at him by his supervisors and other management officials repeatedly over the course of 5 ½ years.  According to USPS, nothing happened to George.

For example, USPS asserts:

> In Case 6, George purports to challenge a letter of warning and two suspensions issued in November 2000, but the USPS rescinded the November 29, 2000 suspension and reduced the November 22, 2000 suspension to a letter of warning through internal grievance processes.  <u>Supra</u> at 8-10; Cabato Decl. Ex. 30, Ex. 29.  Thus, the two suspensions were not final adverse actions.  Also, as just discussed, USPS letters of warning do not constitute adverse actions - -

Doc. 67, at Page 26 of 33 (USPS page 20).

In the 9 April 2001 Notice of Proposed Removal, USPS specifically cites the 29 November 2000 suspension and two 22 November 2000 letters of warning as being "considered in making the determination to remove you."  U.S. 0006058.

1      In *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972), the Court
2 identified the congressional intention for standing under the Title VII, citing *Hackett*
3 *v. McGuire Bros., Inc.*, 445 F.2d 442 (3rd Cir. 1971) for the proposition that the use
4 in 42 U.S.C. § 2000e-5 of the language 'a person claiming to be aggrieved' shows a
5 congressional intention to define standing as broadly as is permitted by Article III of
6 the Constitution."

7      Despite all of USPS' arguments about whether the actions taken against George
8 are "adverse actions" or not, they cannot deny these letters of warning and suspension
9 have caused him to be aggrieved as USPS used them in determining his removal.
10 Other prior letters were also used in other subsequent actions complained about.

11      USPS also has not addressed the issue that the complained about actions are not
12 merely a letter of warning, counseling, or an investigative interview, but include what
13 occurred in the taking of those actions.  George requested in each of his administrative
14 formal complaints "that management will not in any way induce individuals to take
15 any adverse action (as I define it) against me and that any dealings with me be made
16 in a fair manner . . .." U.S. 0007255.  The 5 ½ years of George's administrative cases
17 repeatedly put USPS on notice of its local management's actions toward George (in
18 some 25 EEO cases), but USPS did nothing to stop them.

19      Title VII prohibits discrimination in the workplace, but it is more than just a
20 top-down enforcement mechanism that imposes equality values on an unwilling
21 society. [7]  It also plays a fundamental role in radically reshaping societal norms in a

---

[7]     More specifically, the statute makes it unlawful for an employer "to fail or refuse to
hire or to discharge any individual, or otherwise to discriminate against any individual with respect
to his compensation, terms, conditions, or privileges of employment, because of such individual's
race, color, religion, sex, or national origin." Civil Rights Act of 1964, Section 703 (42 U.S.C. §
2000e-2(a) (2000)).  With this broad prohibition, Title VII is the primary federal law regulating
discrimination in the workplace. Although other pieces of federal legislation govern aspects of the
employment relationship, they are, generally speaking, more narrow in scope. See, e.g., Federal Age
Discrimination in Employment Act, 29 U.S.C. §§ 621-34 (2000) (prohibiting age discrimination in
employment).

way that can facilitate meaningful change from the bottom-up. [8]  And just as Title VII does more than simply provide a rule of liability for those who discriminate, its anti-retaliation provision, can do more than facilitate the imposition of that liability.  Civil Rights Act of 1964, as amended, Section 704 (42 U.S.C. § 2000e-3(a)).

By Title VII ensuring that individuals report possible discrimination, it can facilitate open communication about what conduct violates that norm, and it can help victims cope with, and recover from, the psychological and dignitary harms that such discrimination often causes.  But if the anti-retaliation provision is interpreted too narrowly, such that it often fails to protect individuals who report conduct that they believe violates Title VII, it will be unable to serve any of these purposes.

The fact that retaliation victims are often afraid to report discrimination can hardly be disputed. [9]  One study found that "more than one-third of those who reported unfair treatment took no further action, and only 3% reported suing their employer." [10]  One commentator has noted: "that the most common way victims deal with harassment is not to complain, but rather, to avoid or dismiss it.  These passive strategies run from simply ignoring the harassment to transferring or quitting one's job."  Beth A. Quinn, <u>The Paradox of Complaining: Law, Humor, and Harassment in the Everyday Work World</u>, 25 Law & Soc. Inquiry 1151, 1154 (2000).  Employees may also worry about straining their relationships with co-workers and supervisors, even if they do not face formal retaliation.  Ronald Turner, <u>A Look at Title VII's Regulatory Regime</u>, 16 W. New Eng. L. Rev. 219, 470-71 (1994) 470-71 (questioning

---

[8]     By rejecting the idea that racial stereotypes and gender norms are acceptable, Title VII has helped to create a widespread societal commitment to the equality principle. In this sense, Title VII is what Linda Hamilton Krieger has described as a "transformative law," one "aimed at changing social norms which it perceives to be unjust or otherwise undesirable." Linda Hamilton Krieger, <u>Afterword: Socio-Legal Backlash</u>, 21 Berkeley J. Emp. & Lab. L. 476, 479 (2000).

[9]     See, e.g., Michael J. Yelnosky, <u>Title VII, Mediation, and Collective Action</u>, 1999 U. Ill. L. Rev. 583, 587-88 ("Prospective Title VII plaintiffs worry about retaliation, particularly if they are still employed by the defendant, and worry about being labeled 'trouble makers.'").

[10]     Laura Beth Nielsen & Aaron Beim, <u>Media Misrepresentation: Title VII, Print Media, and Public Perceptions of Discrimination Litigation</u>, 15 Stan. L. & Pol'y Rev. 237, 241 (2004).

---

whether victims should be "concerned that bringing a claim may affect [their] future relationship with [their] employer and coworkers, that [their] ongoing employment relationship will be strained by [their] daily contact with individuals whom [they have] identified as discriminators, or that the employer will in some way unlawfully retaliate against [them] because [they] filed a claim").  Some commentators have also expressed concern that certain entities have established affirmative roadblocks to the filing of employee complaints.  See, *e.g.*, Anne Lawton, The Bad Apple Theory in Sexual Harassment Law, 13 Geo. Mason L. Rev. 817, 838 (2006) (claiming that employers have "incentives to make reporting more difficult" because "the lower federal courts have failed in their oversight of employers' judgments on how to implement anti-harassment policies and procedures"); Nielsen & Beim, fn 4, at 241-42 (noting the "significant barriers confronting plaintiffs, including... a managerialized version of dispute processes that favors the organization, that the EEOC turns away almost 80% of complainants with no relief, that victims are unlikely to file suit, that plaintiffs who file lawsuits face low chances of success, and that plaintiffs who manage to win at trial are likely to lose on appeal"); Turner, Thirty Years, *supra*, at 461 (highlighting one lawyer's concern that "EEOC investigators 'have a strong incentive to discourage people from making a charge that is hard to investigate'" (quoting Peter T. Kilborn, Backlog of Cases Is Overwhelming Jobs-Bias Agency, N.Y. Times, Nov. 26, 1994, at 10)).

The anti-retaliation provision's participation clause largely delivers what it promises: absolute protection from retaliation for participation, of any kind, in a proceeding related to Title VII. [11]

With Supreme Court guidance on the first question, it seems fairly well-settled in the courts of appeals that "opposition to a Title VII violation need not rise to the level of a formal complaint to receive statutory protection."  *Cruz v. Coach Stores,*

---

[11]    Dorothy E. Larkin, Note, Participation Anxiety: Should Title VII's Participation Clause Protect Employees Participating in Internal Investigations, 33 Ga. L. Rev. 1181, 1191 (1999).

*Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).  Thus, for example, a plaintiff is protected if she "mak[es] complaints to management, writ[es] critical letters to customers, protest[s] against discrimination by industry or by society in general, and express[es] support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).

Some courts have also held that "opposition" encompasses efforts to deter future acts of discrimination, as illustrated in *EEOC v. HBE Corp.* 135 F.3d 543 (8th Cir. 1998).

In *HBE Corp.*, the Eighth Circuit concluded that the plaintiff had engaged in protected conduct when he refused to fire another employee because he believed that the employer's decision was racially motivated.  *Id.* at 557.  The court explained that "[o]pposition must be based on a reasonable belief that an employer has engaged in discriminatory conduct, and it can include refusal to implement a discriminatory policy." *Id.* at 554.  In *EEOC v. Navy Federal Credit Union*, 424 F.3d 397 (4th Cir. 2005), the plaintiff objected to losing supervisory authority over an employee and refused to sign what she viewed as a misleading evaluation of that employee because she believed it was all part of a scheme to terminate the employee in retaliation for her allegations of discrimination.  *Id.* at 406.  The Fourth Circuit held that this conduct was protected, noting that "protected oppositional activities may include 'staging informal protests and voicing one's own opinions in order to bring attention to an employer's discriminatory activities.'" *Id.* (quoting *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998)).

In the hostile work environment context, the Supreme Court has cautioned that not every offensive utterance or epithet is actionable under Title VII; *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (noting that Title VII "takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury").  Rather, "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the

1   victim's employment and create an abusive working environment." *Meritor Sav. Bank,*

2   *FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation marks and alteration

3   omitted).

4        In determining whether conduct is "severe or pervasive," the Supreme Court

5   has instructed the lower courts to consider "all the circumstances, including the

6   frequency of the discriminatory conduct; its severity; whether it is physically

7   threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

8   interferes with an employee's work performance." *Faragher v. City of Boca Raton*,

9   524 U.S. 775, 787-88 (1998) (internal quotation marks omitted).

10       Thus, the Court has tried to provide some guidance as to when conduct is

11  unlawful, but that guidance hardly provides definitive answers as to how a court will

12  rule in any given case.

13       To the contrary, all this guidance makes clear is that there is a line between

14  conduct that is merely "offensive" and conduct that is "abusive," and that line is

15  sometimes fine.  As one commentator has noted, "[b]ecause aggression is so pervasive

16  and integral to social life, yet simultaneously ambiguous and subtle, it is-- not

17  surprisingly--difficult to create a working legal definition of harassment, *i.e.*, of that

18  particular category of severe and repetitive emotional abuse that a humane legal

19  system might want to prohibit."  Brady Coleman, <u>Pragmatism's Insult: The Growing</u>

20  <u>Interdisciplinary Challenge to American Harassment Jurisprudence</u>, 8 Emp. Rts. &

21  Emp. Pol'y J. 239, 242 (2004).  Even Justice Scalia has noted that the word

22  "'[a]busive' (or 'hostile,' which in this context I take to mean the same thing) does not

23  seem to me a very clear standard," and the level of "clarity is [not] at all increased by

24  adding the adverb 'objectively' or by appealing to a 'reasonable person['s]' notion of

25  what the vague word means." *Harris*, 510 U.S. at 24 (Scalia, J., concurring) (final

26  alteration in original).

27       Contrary to USPS' assertions about *Burlington Northern & Sante Fe Railway*

28  *Co. v. White* ["*White*"], 548 U.S. 53 (2006), the Court in *White* held that, for actions

to be considered retaliatory, they need not necessarily be actions that negatively affect "terms, conditions, or benefits of employment" or relate only to "ultimate employment decision."  *Id*. at 60 (citing standards previously employed by various circuit courts). Moreover, retaliatory actions are not limited to actions directly related to employment or that occur in the workplace.  Rather, retaliatory actions may include any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id*. at 68 (adopting the standards that had been previously employed by the Seventh and D.C. Circuits).

In *Meacham v. Knolls Atomic Power Laboratory*, 128 S.Ct. 2395 (2008), the Supreme Court held in a disparate impact age discrimination case that the employer, not the employee, has the burden of proving that a given reduction in force (or other employment action) that disproportionately impacts older workers was based on some "reasonable factor other than age."  The Supreme Court clarified that, like the *bona fide* occupational qualification defense (also found in the Age Discrimination in Employment Act), the reasonable factor other than age defense is an affirmative defense that requires individuals seeking the benefit of the defense to bear the burden of proof.

The *Meacham* decision is significant because the case establishes that an employer's mere articulation of a reason other than age for the results of a reduction in force or other employment action that disproportionately affects older workers is an insufficient legal defense.  To avoid liability, the employer must affirmatively prove that it made the relevant decision for a reason other than age and, further, that the criteria used were reasonable.

In *Hishon v. King & Spalding*, 467 U.S. 69 (1984), Elizabeth Hishon, a female associate, filed suit against King & Spalding, a law firm, alleging sex-based discrimination under Title VII.  Prior to hiring Hishon, King & Spalding allegedly dangled the prospect of becoming partner as a recruiting device for young lawyers, such as Hishon, to join the firm.  The firm promised that associates who received

satisfactory evaluations would advance to partner status after five to six years of employment.  A general standard existed that if an associate was not asked to become partner within that time frame, then the firm notified the associate to begin looking for another job.  In other words, if the firm decided not to promote the associate to partner, the firm would terminate the associate's employment.  In Hishon's sixth year of employment at the firm, she was due to be considered for partnership but was rejected. She worked her seventh year, and the partners again declined to promote her. At this point, Hishon's relationship with King & Spalding terminated, and she sued for sex-based discrimination under § 703 of Title VII. 42 U.S.C. § 2000e-2a (2000); *Hishon*, 467 U.S. at 71-72.

Hishon alleged that by denying her the opportunity to become partner due to her sex, the firm discriminated against her with respect to a term, condition, or privilege of employment.  *Hishon*, 467 U.S. at 72, 75.  The United States District Court of the Northern District of Georgia dismissed Hishon's case for failing to state a cognizable claim under Title VII, and the United States Court of Appeals for the Eleventh Circuit affirmed. Id. at 72-73.

The Supreme Court granted certiorari to decide whether Hishon's complaint was properly dismissed.  *Id*. at 73.  The Court reversed and remanded the case, entitling Hishon to her day in court.  *Id*. at 78-79.  In dictum, the Supreme Court broadly interpreted the Civil Rights Act of 1964 § 703 "terms, conditions, or privileges of employment" language, especially with regard to privileges of employment.  *Id*. at 75-76.

The Court noted that a noncontractual benefit of employment may qualify as a "privilege" under § 703 if the benefit is given in a discriminatory manner.  *Id*. at 75 ("Such a benefit ... may qualify as a 'privileg[e]' of employment under Title VII." (alteration in original)).

To fit within the scope of a privilege, the benefit must be "part and parcel of the employment." *Id*.  In other words, "[t]hose benefits that comprise the incidents of

employment, or that form an aspect of the relationship between the employer and employees, may not be afforded in a manner contrary to Title VII." *Id*. at 75-76. The Court observed that Hishon's situation is the type of privilege Title VII attempts to protect. *Hishon*. at 76. Given the specific facts of the case, "the opportunity to become a partner was part and parcel of an associate's status as an employee" of the firm. *Id*. Although ultimate employment actions, such as hiring and firing, always constitute § 703 adverse employment actions, this case assumes that a failure to promote may be actionable independent of a discharge. The 1984 case created a fuzzy line for how much harm a plaintiff must allege under § 703 to sustain a cause of action for discrimination, which later resulted in future conflicts between lower courts. [12] By suggesting that such a claim may be actionable absent an ultimate employment action, such as discharge, the Court broadened the "terms, conditions, or privileges of employment" language and opened the door for future claims asserting less direct economic harm. *Hishon*, 467 U.S. at 75-76.

The Supreme Court subsequently noted that the harm needed for an actionable discrimination claim need not be accompanied by "tangible" or "economic" harm. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64 (1986), in which case a female bank teller, Vinson, claimed she was a victim of sex discrimination. Her discrimination claim was based on allegations of sexual harassment. The United States District Court for the District of Columbia found that Vinson had not sufficiently proved a claim of discrimination based on sexual harassment; however, the United States Court of Appeals for the District of Columbia Circuit disagreed, holding that a claim under Title VII may be predicated on sexual harassment. *Id*., 477 U.S. at 60-62.

The Supreme Court held that the harm needed to demonstrate discrimination under Title VII is not limited to economic or tangible harm. *Id*., 477 U.S. at 64.

---

[12]    Compare *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232 (11th Cir. 2001) (setting the Eleventh Circuit standard that unless a hostile work environment is shown, only direct economic harm satisfies the harm element of § 703), with *Wedow v. City of Kansas City, Mo.*, 442 F.3d 661 (8th Cir. 2006) (holding that noneconomic harm can be shown to satisfy the harm element of § 703).

Instead, the Court held that a plaintiff may establish a claim of sex discrimination based on a hostile or abusive work environment that does not necessarily result in a corresponding economic loss. *Meritor*, 477 U.S. at 65. Examples of workplace conduct that could be actionable under Title VII include "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Id.*, 477 U.S. at 65. This kind of workplace conduct is generally termed a "hostile work environment." *Id.*, 477 U.S. at 65. To limit claims to those truly in need of Title VII protection, the Court set a standard for the degree of sexual harassment that establishes the necessary harm for a discrimination claim: The sexual harassment "must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Id.*, 477 U.S. at 67. Accordingly, the Court established that noneconomic harm that meets the "severe or pervasive" standard is sufficient to demonstrate an actionable § 703 claim, thereby broadening the "terms, conditions, or privileges of employment" language even further. *Id.*, 477 U.S. at 65-67.

In 2006, the Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White* ["*White*"], 548 U.S. 53 (2006). set the standard for defining the harm, or adverse employment action, element required to prove retaliation under § 704. *Id.*, 548 U.S. at 61-64; 42 U.S.C. § 2000e-3a (2000).

To establish a retaliation claim under § 704, "a plaintiff must show that (1) he engaged in statutorily protected [activity]; (2) he suffered an adverse employment action;" and (3) a causal connection existed between the protected activity and the adverse action. Section 704 retaliation claims and § 703 discrimination claims are commonly asserted together because the plaintiff's employment may be detrimentally affected in reprisal for having alleged unlawful employment discrimination. Many courts, before the *White* decision, used the same standard to determine whether a plaintiff sufficiently showed an adverse employment action for § 703 discrimination claims and § 704 retaliation claims. In *White*, the Supreme Court rejected the

approach taken by the Sixth Circuit that only ultimate employment decisions satisfied the "adverse employment action" element of both retaliation and discrimination claims).

Although the Court's decision in *White* defined harm for § 704 retaliation claims, its analysis contrasted § 703 claims of discrimination. *White*, 548 U.S. at 61-64.

The issue before the Supreme Court was "how harmful an act of retaliatory discrimination must be in order to fall within the [anti-retaliation] provision's scope." *Id.*, 548 U.S. at 61. Section 704(a) establishes a claim under Title VII for retaliation: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees" because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a) (2000).

The United States Court of Appeals for the Sixth Circuit concluded that § 704 retaliation claims should be read in pari materia [13] with § 703 discrimination claims. Therefore, the Sixth Circuit required a link between the retaliatory conduct and the plaintiff's terms, conditions, or privileges of employment, even though that language is not written in § 704. *White*, 548 U.S. at 61.

The Supreme Court disagreed with the Sixth Circuit's interpretation and decided that Congress intentionally meant to leave the "terms, conditions, or privileges of employment" language out of § 704, despite its use in § 703. *Id.*, 548 U.S. at 63.

The Court held that the statutes could not be read together because they differed not only in language but also in purpose. *Id.*, 548 U.S. at 63.

The § 703 discrimination provision "seeks to prevent injury to individuals" in

---

[13] In pari materia literally means "part of the same material" and is a canon of statutory interpretation. Linda D. Jellum & David Charles Hricik, Modern Statutory Interpretation: Problems, Theories, and Lawyering Strategies 172 (2006). "Generally, this canon reflects the common sense notion that if the legislature uses the same words when legislating on similar subjects, those words should be given the same meaning." *Id.*

1  employment based on that individual's race, color, religion, sex, or national origin.

2  *White*, 548 U.S. at 63.

3      The § 704 anti-retaliation provision, however, "seeks to prevent harm to

4  individuals based on what" the employer does, meaning the employer's conduct in

5  punishing plaintiffs for opposing the employer's practices that the plaintiff reasonably

6  believes may violate § 703. *Id.*, 548 U.S. at 63.

7      Accordingly, the Supreme Court concluded that the anti-retaliation section,

8  unlike the anti-discrimination section, "is not limited to discriminatory actions that

9  affect the terms and conditions of employment." *Id.*, 548 U.S. at 64.

10     Indirect economic harms are employer actions that indirectly cause an economic

11  impact on the employee.  While the majority of the circuits take varied approaches to

12  what is considered adverse employment action, they all consider the requirement met

13  by an employer's action that directly or indirectly causes an employee economic harm.

14     One type of indirect economic harm occurs when an employer's action has or

15  will affect the employee's future job prospects.  If an employer hinders an employee's

16  future employment opportunities by inhibiting the employee's ability to be promoted

17  or obtain employment elsewhere based on the action at issue, the employer's action

18  causes an indirect economic impact on the employee.  Therefore, some circuits take

19  the approach that if an employee presents enough evidence to show that an employer's

20  action obstructed the employee's future job opportunities, the harm element of § 703

21  will be satisfied.

22     In *Wiley v. Glassman*,  511 F.3d 151, 157 (D.C. Cir. 2007), the United States

23  Court of Appeals for the District of Columbia held that a denial of an employee's

24  participation in a manager rotation program constitutes adverse employment action

25  because the denial directly affected the employee's opportunity for a future promotion.

26  *Id*. at 157.

27     The D.C. Circuit held that "[a]n employment action may be sufficient to support

28  a claim of discrimination if it results in 'materially adverse consequences affecting .

. . future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."' *Wiley*, 511 F.3d at 157 (ellipsis in original) (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002)).

The Seventh Circuit defines adverse employment action as a materially adverse action "that diminishes an employee's compensation or benefits, constitutes a nominally lateral transfer but nonetheless reduces an employee's career prospects, or subjects an employee to altered working conditions that are degrading and humiliating." *Whigum v. Keller Cresent*, 260 Fed.Appx. 910, 913 (7th Cir. 2008).

The EEOC's position on reprisal is not limited to ultimate adverse employment actions suggested by USPS. For example:

*Smith v. Potter*, 2009 WL1117619 *6 fn 2 (15 April 2009): "The Commission has a policy of considering reprisal claims with a broad view of coverage. See *Carroll v. Department of the Army*, EEOC Request No. 05970939 (April 4, 2000). Under Commission policy, claimed retaliatory actions that can be challenged are not restricted to those which affect a term, condition, or privilege of employment. See *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006); EEOC Compliance Manual Section 8, "Retaliation," No. 915.003 (May 20, 1998), at 8-15. Rather, a complainant is protected from any discrimination that is reasonably likely to deter protected EEO activity. See *id*." The same in *McMillen v. Potter*, 2009 WL 591025 *5 (26 February 2009).

Again, in *White*, 548 U.S. 53 (2006), the Court held that, for actions to be considered retaliatory, they need not necessarily be actions that negatively affect "terms, conditions, or benefits of employment" or relate only to "ultimate employment decision." *Id*. at 60 (citing standards previously employed by various circuit courts). Moreover, retaliatory actions are not limited to actions directly related to employment or that occur in the workplace. Rather, retaliatory actions may include any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 68 (adopting the standards that had been previously

1   employed by the Seventh and D.C. Circuits).

2       3.      Similarly Situated Employees and the Use of "Me, Too" Evidence

3       The Postal Service admits that the comparison to the other carriers is relevant

4   to the issue of whether George was treated differently than his similarly situated peers.

5   This is the "me, too" defense.

6       There are several easy categories of "me too" cases.  Those categories include

7   attempts to prove the existence or non-existence of a culture or atmosphere of

8   discrimination, *Velazequez-Garcia v. Horizon Lines of P.R., Inc.*, 473 F.3d 11, 18-19

9   (1st Cir. 1979),   *Asmo v. Keane, Inc.*, 471 F.3d 588, 595 (6th Cir. 2006), and

10  *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 770 (7th Cir. 2006);  attempts

11  to establish the existence or non existence of a hostile work environment,  *Goldsmith*

12  *v. Bagby Elevator Co.*, 513 F.3d 1261, 1285-87 (11th Cir. 2008) (finding that "me

13  too" evidence  was  admissible  to  prove  an  intent  to  retaliate  against  any  black

14  employee who complained about racial slurs, a hostile work environment due to the

15  repeated use of racial slurs, and an atmosphere of discrimination in the workplace);

16  and attempts to prove the existence on non-existence of  reprisal  or  discrimination,

17  *Int'l. Bhd. of Teamsters v. United States*, 431 U.S. 324, 362 (1977) where the "me too"

18  evidence concerns the same decisionmaker as the plaintiff.  *Goldsmith*, 513 F.3d at

19  1286.

20      The Postal Service claims that George cannot show that there were similarly

21  situated employees treated more favorably - the garden variety disparate treatment

22  case.  What the Postal Service does not indicate is that across George's cases, it does

23  not  show  that  other  employees  were  treated  the  same.   For  example,  in  Case 1

24  [Administrative Case No. 4F-956-0069-97], George's postal driver's license was

25  taken away until he completed a special training course with VOMA Jerry Kendricks.

26  No evidence has been produced by USPS to show any of carrier, whether in similar

27  situation or not, had their postal driver's license taken away, nor that anyone else,

28  whether in similar situation or not, had to complete any special training course before

having their postal license returned.  George's postal vehicle was hit while it was parked and he was away from it.  The record shows other carriers being at fault for accidents occurring while they were driving their postal vehicles.

For example, in Case 4 [the 1997 case for failing to follow instructions about use of mail delivery tray, Administrative Case No. 4F-956-0063-98].  The Postal Service has not provided any evidence of a specific rule about placing a lunch pail on a delivery tray, nor any evidence that others did not place lunch pails on their delivery trays, nor any evidence that others who placed lunch pails on their delivery trays were disciplined.

In retaliation cases, to raise an inference of discriminatory retaliation, *Johnson v. Palma*, 931 F.2d 203 (2nd Cir. 1991), George must show (1) He participated in a protected activity; (2) Knowledge of that activity by the agency of the protected activities (3) An adverse action was taken; and (4) A causal connection between the protected activity and the agency's adverse action.  A causal connection may be established by showing that the protected activity was followed closely by discriminatory treatment, that the agency treated the employee differently from similarly situated employees who had not participated in EEO activity, or that the agency treated George differently than it treated him before he engaged in the protected activity.  There is no absolute requirement in a reprisal case that there be similarly situated peers for the causal link.

Recently, the Supreme Court issued *Sprint/United Management Co. v. Mendelsohn* [*"Mendelsohn"*]*,* 128 S.Ct. 1140 (2008), a case that started out rather unremarkably.  Sprint terminated the plaintiff, a fifty-one year old woman with thirteen years of seniority, as part of a  reduction in force.  She sued Sprint and asserted a disparate treatment theory of discrimination under the Age Discrimination in Employment Act.  The plaintiff sought to introduce testimony from five other Sprint employees who also claimed that their supervisor discriminated against them because of their age.  Three of these witnesses asserted that they heard denigrating

1  remarks about older workers.  One of these three claimed to have seen a spreadsheet
2  suggesting that a supervisor considered age in making the layoffs.  Another asserted
3  that he was banned from working at Sprint because of his age, and that he witnessed
4  Sprint harass another employee because of her age.  The last witness alleged that
5  Sprint had to get permission before hiring anyone over the age of forty, and that after
6  he was terminated, he was replaced by a younger employee.  If these allegations were
7  true, it is readily apparent how a jury might be influenced by such testimony.  The
8  problem was that  none of these "me too" witnesses worked in the same department
9  as the plaintiff, none of these witnesses worked under the various supervisors who
10 supervised the plaintiff, and none of these witnesses reported hearing discriminatory
11 remarks by any of the plaintiff's supervisors.

12      At the District Court, Sprint moved to exclude testimony by the other
13 employees by claiming that it was irrelevant under rule 401, F.R.E., because different
14 supervisors were involved.   Sprint also argued that any probative value to this
15 testimony was outweighed by the danger of unfair prejudice under rule 403, F.R.E.
16 Remarkably, the District Court did not issue a full written opinion or indeed any
17 opinion.  Instead, it issued a minute order that stated:

18      Plaintiff may offer evidence of discrimination against Sprint employees who are similarly
        situated to her. 'Similarly situated employees,' for the purpose of this ruling, requires proof
19      that (1) Paul Ruddick [sic] was the decisionmaker in any adverse employment action; and
        (2) temporal proximity.
20

21 *Mendelsohn*, 128 S.Ct. at 1145 (2008) (quoting Appendix to Petition for Writ of
22 Certiorari at 24a, *Mendelsohn*, 128 S.Ct. 1140 (March 5, 2007)).

23      On appeal, the Tenth Circuit, interpreted the district court's minute order as a
24 *per se* rule that evidence from employees with different supervisors was inadmissible.
25 *Mendelsohn*, 466 F.3d at 1225.  The Tenth Circuit reversed this holding and undertook
26 its own analysis of this issue, concluding that the evidence in question was relevant,
27 not unduly prejudicial, and therefore remanded the case for a new trial.  *Mendelsohn*,
28 466 F.3d at 1228-1232.  Certiorari was granted to determine if "me too" evidence

would only be admissible if it involved the same individuals who supervised the plaintiff. *Mendelsohn*, 128 S.Ct. at 1143.

Before the Supreme Court, the parties focused on two issues. First, whether the evidence was relevant under Rule 401 and second, even if such evidence were admissible, whether it could be excluded as unduly prejudicial under Rule 403. The Court held, however, that the Tenth Circuit erred in concluding that the district court applied a *per se* rule of inadmissibility. The Supreme Court concluded that there was an unclear basis for the district court's ruling, and therefore, a remand was necessary. The Court went on to explain that it is the District Court's role to weigh the evidence and make a decision in the first instance explicitly and on the record. This was considered particularly important because appellate courts are required to pay deference to lower determinations under Rule 403, since district courts will have heard the proffered evidence and will likely be more familiar with the cases. Thus, the Court concluded that the Tenth Circuit also erred by deciding this issue in the first instance.

At the end of the opinion, the Court did give some guidance about how it might rule in future cases. Specifically, the Court held that "me too" evidence involving other supervisors is neither *per se* admissible or *per se* inadmissible. The Court reasoned:

> The question whether evidence of discrimination by other supervisors is relevant in an individual ADEA case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case. Applying Rule 403 to determine if evidence is prejudicial also requires a fact-intensive, context-specific inquiry.

*Mendelsohn*, 128 S.Ct. at 1247. Additionally, in what may become the most significant part of this decision, the Court stated in dicta:

> We note that, had the District Court applied a *per se* rule excluding the evidence, the Court of Appeals would have been correct to conclude that it abused its discretion. Relevance and prejudice under Rules 401 and 403 are determined in the context of the facts and arguments in a particular case, and thus are generally not amenable to broad *per se* rules .... But as we have discussed, there is no basis in the record for concluding that the District Court applied a blanket rule.

1  *Mendelsohn*, 128 S.Ct. at 1247.  While the Supreme Court does not provide clear
2  guidance in *Mendelsohn* with respect to where the line of demarcation is between
3  admissible and inadmissible "me too" evidence, it does endorse the view that such
4  evidence can be admissible in cases involving supervisors responsible for the adverse
5  job decision claimed to be discriminatory.

6      The "me, too" evidence in George of how the other carriers who engaged in
7  similar conduct, who took as longer to deliver a route, or a supervisor's treatment of
8  other employees may be relevant and admissible, not to prove conduct in conformity
9  therewith, but to show that supervisor's state of mind, intent or motive for certain
10 employment-related acts against the plaintiff.  *Goldsmith v. Bagby Elevator Co.*, 513
11 F.3d 1261, 1286 (11th Cir.2008) (finding that "me too" evidence may be admissible
12 under Rule 404(b) to prove employer's motive, intent or plan to discriminate against
13 plaintiff);  *Heyne v. Caruso,* 69 F.3d 1475, 1480 (9th Cir.1995) ("evidence of [a
14 supervisor's] sexual harassment of other female workers may be used, however, to
15 prove his motive or intent in discharging [an employee]," such that trial court erred
16 in excluding evidence that supervisor harassed other employees);  *Zubalake v. UBS
17 Warburg, LLC*, 382 F.Supp.2d. 536, 544 (S.D.N.Y.2005) ("As a general rule, the
18 testimony of other employees about their treatment by the defendant is relevant to the
19 issue of the employer's discriminatory intent.") (citations omitted).

20      In regards to the specific Motion in issue, USPS made it impossible for the lack
21 of similarly situated peers to be presented.  In fact, USPS did not present evidence that
22 others who engaged in similar conduct, such as routine excessive use of time, were
23 treated the same as George.  And if others did receive discipline for such things as
24 excessive use of time, USPS has provided no evidence to justify such charges because,
25 like with George, USPS provides no evidence to show that the "excessive time"
26 exceeded the normal evaluated route time adjusted for the volume of mail being
27 delivered, *i.e.*, the time that USPS' standards set as the appropriate amount of time for
28 the delivery.

George did provide with his 13 July 1998 EEO affidavit in 4F-956-0052-98 [Cases 3 through 5 herein] signed responses from similarly situated peers to a questionnaire he prepared, which shows:

- 9 carriers admitting they had gone over the time estimated on their Form 3996s (plus one who did not), with all but one of them indicating that they were never disciplined for exceeding their estimates.

- 9 carriers admitting they put personal items on the LLV delivery tray, with all indicating they were never told they could not do so.

- 12 carriers admitting they do not always have their mail ready for delivery when they arrive at the house, with half indicating they had been told to have the mail ready.

U.S. 0005158-64.

Postal Service cannot deny it was notified by George in the administrative process of his request for relevant documents.

Postal Service cannot deny that there are major gaps of documents that support numerous defenses.  As an example, where are the documents to prove DeLeon's claim that George continually used unnecessary auxiliary assistance and was in the bottom 25% of all carriers in the city of Merced.

DeLeon was a management employee intimately involved in the disciplinary actions in issue.  The agency provided parts of the 4F-956-0012-99 file, which included a statement from DeLeon that "Jody rarely completes his daily assignment within the routes evaluated time and uses excessive auxiliary assistance on a regular basis.  Within my group of carriers at that given time Jody's performance was the poorest in the group...."  Where are the documents that support DeLeon's assertion that George rarely completes his daily assignment within the routes evaluated time, and, while George may need auxiliary assistance on a regular basis because of the mail volume, where are the documents to show such use was "excessive."?

George was in a T-6 carrier assignment, which meant that he did not deliver the

same route 5 days a week - rather he covered 5 or 6 routes on the days the regular carriers were off.  Missing documents and/or evidence that the USPS could have provided to support this statement would include:

    (1)    the evaluated time of the routes that George was assigned prior to DeLeon's statement and any route inspections to ensure that the routes were properly evaluated;

    (2)    the time used on the routes by the regular carriers because George was a T-6, which means that he only was on a route 1 day a week, while the regulars were on it the rest of the week (unless they were off work on vacation or illness/injury);

    (3)    the overtime documents to support the statement "Jody rarely completes his daily assignments;"

    (4)    all documents which support the assertion that he uses "excessive auxiliary assistance on a regular basis" for him and those other carriers in the office;

    (5)    the evaluations of all other carriers in DeLeon's group to support that Mr. George was the "poorest" in his group;

    (6)    the 1800 reports [reports indicating that the regular carrier delivered his route prior to 6:00 p.m.];

    (7)    flash reports and function audits to show the times that the assigned carriers completed their routes in comparison to George.

Postal Service must at some point do more than merely articulate a defense or reason for its actions. If all it has to do is articulate a defense without meeting is burden of persuasion, it could make up anything.  If it can make up any reason and then not have any evidence that supports that reason, whether by destruction or loss, it would be impossible for anyone to counter it.

The Postal Service cannot claim ignorance of its duty to preserve relevant evidence.

1       This district has been in the forefront of ESI (electronically stored information)

2   for years.  In *Cabinetware Inc. v. Sullivan*, 1991 WL 327959 (E.D. Cal 1991), Judge

3   Karlton took the position that the imposition of a default judgment for the spoliation

4   of electronically stored information was appropriate because "Destruction of evidence

5   cannot be countenanced in a justice system whose goal is to find the truth through

6   honest and orderly production of evidence under established discovery rules."

7       In *Metropolitan Opera Ass'n. v. Local 100, Hotel Employees*, 212 F.R.D. 178

8   (S.D. N.Y.  2003), after a 31 page description of the requested discovery, discovery

9   disputes, motions and letter briefs to describe the discovery "war," the court held:

> Courts have also noted Rule 37 sanctions may be applied both to penalize conduct that
> warrants sanctions and "to deter those who might be tempted to such conduct in the absence
> of such a deterrent." *National Hockey League*, 427 U.S. at 643, 96 S.Ct. 2778; *see also
> Penthouse*, 663 F.2d at 386.  In Rule 37 cases, intentional behavior, actions taken in bad
> faith, or grossly negligent behavior justify severe disciplinary measures.  *See Penthouse*, 663
> F.2d at 387; *Altschuler*, 109 F.R.D. at 356.  The *Residential Funding* court also recalled
> earlier holdings that in determining whether evidence was made unavailable by a party with
> a culpable state of mind, the sanction of an adverse inference instruction was also available
> for negligent conduct. *See* 306 F.3d at 108 (citing *Byrnie v. Town of Cromwell*, 243 F.3d 93,
> 109 (2d Cir.2001)); *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 268 (2d Cir.1999);
> *see also Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75 (S.D.N.Y.1991) ("[The]
> sanction [of an adverse inference] should be available even for the negligent destruction of
> documents if that is necessary to further the remedial purpose of the inference. It makes little
> difference to the party victimized by the destruction of evidence whether that act was done
> willfully or negligently.  The adverse inference provides the necessary mechanism for
> restoring the evidentiary balance.  The inference is adverse to the destroyer not because of
> any finding of moral culpability, but because the risk that the evidence would have been
> detrimental rather than favorable should fall on the party responsible for its loss.").

*Metropolitan Opera*, 212 F.R.D. at 219.   The court continued to describe why

sanctions should be issued:

> In my consideration of the Union's and its counsel's conduct in this case, two statements are
> particularly apt.  In *National Association of Radiation Survivors v. Turnage*, 115 F.R.D. 543
> (N.D.Cal.1987) now-Chief Judge Patel wrote:
>
> > The [defendant's] various discovery omissions are directly attributable to the failure
> > of defendant and its counsel to establish a coherent and effective system to faithfully
> > and effectively respond to discovery requests....   [T]he defendant employed an
> > unconscionably careless procedure to handle discovery matters, suggesting a callous
> > disregard for its obligations as a litigant.
>
> >        \* \* \* \* \* \*
>
> The court concludes that defendant and its counsel failed in a variety of instances to conduct
> any reasonable inquiry into the factual basis of its discovery responses.... Such an inquiry

would have required, at a minimum, a reasonable procedure to distribute discovery requests to all employees and agents of the defendant potentially possessing responsive information, and to account for the collection and subsequent production of the information to plaintiffs. Id. at 556.

With equal applicability to this case, Judge Kugler wrote in *Tarlton v. Cumberland County Correctional Facility,* 192 F.R.D. 165 (D.N.J.2000):

> It is not an excuse that defense counsel did not know about the retention of the cover sheets. Counsel had a duty to explain to their client what types of information would be relevant and responsive to discovery requests and ask how and where relevant documents may be maintained. The client is charged with knowledge of what documents it possesses. *It was not their option to simply react to plaintiff's fortuitous discovery of the existence of relevant documents by making disjointed searches each time coming up with a few more documents, and each time representing that that was all they had.* Under the federal rules, the burden does not fall on plaintiff to learn whether, how and where defendant keeps relevant documents.

*Id.* at 170 (emphasis added).

*Metropolitan Opera*, 212 F.R.D. at 221.

In *Zubulake v. USB Warburg, LLC,* ["*Zubulake V*"], 229 F.R.D. 422, 2004 WL 1620866 (SD NY 2004) (an extremely argumentative discovery dispute in a simple employment discrimination case, and this is *Zubulake V*), the court found:

> This decision addresses counsel's obligation to ensure that relevant information is preserved by giving clear instructions to the client to preserve such information and, perhaps more importantly, a client's obligation to heed those instructions. Early on in this litigation, UBS's counsel--both in-house and outside--instructed UBS personnel to retain relevant electronic information. Notwithstanding these instructions, certain UBS employees deleted relevant e-mails. Other employees never produced relevant information to counsel. As a result, many discoverable e-mails were not produced to Zubulake until recently, even though they were responsive to a document request propounded on June 3, 2002. In addition, a number of e-mails responsive to that document request were deleted and have been lost altogether.

*Id.* at 424. The court, citing *Zubulake* (*Zubulake IV*), 220 F.R.D. 212 (S.D.N.Y. 2003), considered in response to Zubulake's claim that the employer should have known prior to the filing of an EEOC complaint that documents were relevant, found:

> At the same time, anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary. "While a litigant is under no duty to keep or retain every document in its possession ... it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request."

*Zubulake IV*, 220 F.R.D. at 217. It is this hint or suspicion of future litigation that the

court used to hold that

> once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents.

*Zubulake IV*, 220 F.R.D. at 218.

*Broccoli v. Echostar Communications Corp*., 229 F.R.D. 506 (DC MD, 2005) [another employment case], extends the *Metropolitan Opera* and *Zubulake* decisions to include the duty to preserve any information relevant to the claims or defenses. *Id.* at 510.   In considering the plaintiff's complaints about sexual harassment to her managers [and **not** the filing of the prerequisite EEOC complaint], the court held the complete deletion of e-mails within 30 days of sending or receiving once the hint or suspicion of potential litigation was done at the employer's peril.   Finding that defendant was a large corporation with ample financial resources and personnel management "know how," the court held:

> Echostar clearly acted in bad faith in its failure to suspend its email and data destruction policy or preserve essential personnel documents in order to fulfill its duty to preserve the relevant documentation for purposes of potential litigation.   These bad faith actions prejudiced Broccoli in his attempts to litigate his claims and measurably increased the costs for him to do so.

*Id.* at 512.

For example, in *Byrnie v. Town of Cromwell, Board of Education*, 243 F.3d  93 (2nd Cir. 2001) [discrimination case where the employer had the hint or suspicion of future litigation by a FOIA request prior to any private sector EEOC complaint within 180 days], the court held:

> [W]here, as here, a party has violated an EEOC record-retention regulation, a violation of that regulation can amount to a breach of duty necessary to justify a spoliation inference in an employment discrimination action. Cf. *Favors,* 13 F.3d at 1239 (Title VII rules, Title VII action); *Hicks,* 833 F.2d at 1419 (same).   In such a case we can be confident that the responsible agency had in mind persons in the plaintiff's position and accordingly that our finding a duty to preserve documents in such circumstances will advance the goals of the rule.

*Byrnie*, 243 F.3d at 109.

The Commission's regulation, 29 C.F.R. § 1602.14, states:

> **1602.14 Preservation of records made or kept.**

Any personnel or employment record made or kept by an employer (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer, lay-off or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship) shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later.  In the case of involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of one year from the date of termination.  Where a charge of discrimination has been filed, or an action brought by the Commission or the Attorney General, against an employer under title VII or the ADA, the respondent employer shall preserve all personnel records relevant to the charge or action until final disposition of the charge or the action.  The term "personnel records relevant to the charge," for example, would include personnel or employment records relating to the aggrieved person and to all other employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the aggrieved person applied and was rejected.  The date of final disposition of the charge or the action means the date of expiration of the statutory period within which the aggrieved person may bring an action in a U.S. District Court or, where an action is brought against an employer either by the aggrieved person, the Commission, or by the Attorney General, the date on which such litigation is terminated.

A non-exhaustive list of examples of co-dependent Postal policies include:

– "**Litigation** / You are not to delete any e-mails that pertain to a pending law enforcement or litigation action that you are aware of.  You should place any e-mails that you deem relevant to the pending legal action in a separate folder, for ease of recovery."  Postal Service Management Instruction AS-840-2003-3 (Electronic Messaging (e-mail)) at page 6; same, except AS-870-2005-2 at page 7.

– "**Records Control Schedules**" for 84 broad categories of records are contained in Appendix A of the Postal Employee and Labor Relations Manual ("ELM") Issue 12 (5-1-1989).  A virtually identical listing appears in Appendix A of ELM Issue 13 (June 1998).  These categories include:

   – #25 "*Equal Employment Opportunity (EEO) Discrimination Case Files*" ("[](*EEO) Discrimination Cases*" heading in ELM 13), which these ELMs state includes "other records as described in 29 C.F.R. 1613.222."   (In addition to specifically described documents to be included and excluded, 29 C.F.R. § 1613.222 states: "this file shall contain all documents pertinent to the complaint.")  Both ELMs  require such files to be moved to a closed file upon resolution of the complaint, cutting off the closed file each calendar year, with disposal 4 years after cutoff.

   – #26 "*Equal Employment Opportunity (EEO) Background Files*," which the ELMs require to be moved to a closed file upon resolution of the complaint, cutting off the closed file each calendar year, with disposal 2 years after cutoff.

   – #31 "*Logs or Indexes of Disciplinary and Contract Grievances, and Adverse Action Cases*," which the ELMs state to "[m]aintain and dispose of with the records to which they pertain."

   – #34 "*Accident Reports Records (Local)*," which the ELMs state to "[c]ut off ... each fiscal year; dispose of 5 years from date of cutoff."

– #36 "*Vehicle Accident Investigation and Tort Claims Records,*" with cut off each fiscal year and dispose 2 years (when damages under $10) or 3 years (when damages over $10) after cutoff.

– #61 "*Official Personnel Folders (OPF),*" which if the employee transfers to another federal agency are transferred to the new agency, or if the employee separates from federal service, the OPF is transferred to the National Personnel Records Center, where it is retain for at least 5 years.

– #63 "*Supervisors' Personnel Records:*" including those only to be disposed of "if there has been no disciplinary action initiated against the employee during [a one or two year] period."

– #67 "*Motor Vehicle Operators' Records,*" (including records of accidents incurred in operating Postal vehicles), which are moved to an inactive file upon the employee's separation, expiration of license, recision of authorization, transfer of driver into a nondriving status, or transfer to new installation, with cutoff of file each fiscal year and disposal 4 years from cutoff.

– #70 "*Employee Training Files,*" cut off each calendar year with disposal 5 years from cutoff.

– #76 "*Disciplinary and Contract Grievances and Appeals of Bargaining-Unit Employees,*" are moved to a closed file on receipt of final decision.  Both ELMs note: "No disposal is to occur without approval of the Director, Office of Grievance and Arbitration."

– #77 "*Arbitration Case Files,*" are moved to a closed file upon receipt of final decision, with transfer to Federal Records Center 7 years after cutoff (dispose 15 years after cutoff).

– The Postal Service's "**Privacy Act Systems of Records**" is detailed in the Appendix to the Postal <u>Administrative Support Manual</u> ("ASM").  For example, in ASM 11 (March 1996), 89 different systems of records maintained by the Postal Service under the Privacy Act are identified.  This Appendix acknowledges that the Privacy Act authorizes disclosure of such records for "routine use:" (1) for law enforcement purposes "[w]hen the Postal Service becomes aware of an indication of a violation or potential violation of law, whether civil, criminal, or regulatory in nature" (George has alleged the Postal Service engaged in activities prohibited by Title VII); (2) incident to litigation, as "routine use specifically contemplates that information may be released in response to relevant discovery and that any manner of response allowed by the rules of the forum may be employed;" and (3) to Equal Employment Opportunity Commission "when requested in connection with the investigation of a formal complaint of discrimination filed against the U.S. Postal Service under 29 CFR Part 1614."  In addition to systems of records that encompass many of those listed in the ELM, the Privacy Act System includes, for example:

– USPS 010.040 "Collection and Delivery Records – City Carrier Route Records," which, in addition to specific information about the employee, "[a]lso included is information pertaining to workload, work schedule, performance analysis, and individual work habits; inspection reports of employee workload and workload adjustments; comments by employee and examiner on route adjustments and inspections; and statistical engineering records of carrier and route characteristics.

USPS cannot deny the volume of documentation it is required to maintain, nor can it deny that it withheld material evidence concerning similarly situated peers from George.

4.   **USPS asserts George cannot establish a _prima facie_ case of discrimination because his performance was not satisfactory**

"The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). As to the element of satisfactory performance questioned by USPS, George has met it. For example, George has shown how he meets Merced's evaluated standards for use of route time in Merced. See, for example, Statement of Facts Nos. 3 through 5.

What USPS is asking is for George to overcome his supervisor's articulated defense that he uses "excessive time." The Court continued in *Burdine*:

> *** The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection. See *Teamsters v. United States*, 431 U.S. 324, 358, and n. 44, 97 S.Ct. 1843, 1866, n. 44, 52 L.Ed.2d 396 (1977). As the Court explained in *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), the prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case. [fn omit.]
>
> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. See *Sweeney, supra*, at 25, 99 S.Ct., at 296. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff [fn. omit.]. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. [FN9]
>
> > FN9.   An articulation not admitted into evidence will not suffice. Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel.
>
> The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, [fn omit.] and the factual inquiry proceeds to a new level of specificity.

*Burdine*, 450 U.S. at 253-55.

The Supreme Court expands in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993), stating:

> Thus, the *McDonnell Douglas* presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case- *i.e.,* the burden of "producing evidence" that the adverse employment actions were taken "for a legitimate, nondiscriminatory reason." *Burdine,* 450 U.S., at 254, 101 S.Ct., at 1094. "[T]he defendant must clearly set forth, through the introduction of admissible evidence," reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action. *Id.,* at 254-255, and n. 8, 101 S.Ct., at 1094-1095, and n. 8.

*St. Mary's Honor*, 509 U.S. at 506-507.  Further, in *St. Mary's Honor*:

> For the burden-of-production determination necessarily *precedes* the credibility-assessment stage.  At the close of the defendant's case, the court is asked to decide whether an issue of fact remains for the trier of fact to determine.  None does if, on the evidence presented, (1) any rational person would have to find the existence of facts constituting a prima facie case, and (2) the defendant has failed to meet its burden of production- *i.e.,* has failed to introduce evidence which, *taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.  In that event, the court must award judgment to the plaintiff as a matter of law under Federal Rule of Civil Procedure 50(a)(1) (in the case of jury trials) or Federal Rule of Civil Procedure 52(c) (in the case of bench trials).  See [cites omit].  If the defendant has failed to sustain its burden but reasonable minds could *differ* as to whether a preponderance of the evidence establishes the facts of a prima facie case, then a question of fact *does* remain, which the trier of fact will be called upon to answer. [FN3]
>
> > FN3.  If the finder of fact answers affirmatively-if it finds that the prima facie case *is* supported by a preponderance of the evidence-it *must* find the existence of the presumed fact of unlawful discrimination and *must,* therefore, render a verdict for the plaintiff.  See [cites omit.].  Thus, the *effect* of failing to produce evidence to rebut the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), presumption is not felt until the prima facie case has been *established,* either as a matter of law (because the plaintiff's facts are uncontested) or by the factfinder's determination that the plaintiff's facts are supported by a preponderance of the evidence.  It is thus technically accurate to describe the sequence as we did in *Burdine:* "First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection." 450 U.S., at 252-253, 101 S.Ct., at 1093 (internal quotation marks omitted).  As a practical matter, however, and in the real-life sequence of a trial, the defendant *feels* the "burden" not when the plaintiff's prima facie case is *proved,* but as soon as evidence of it is *introduced.*  The defendant then knows that its failure to introduce evidence of a nondiscriminatory reason will cause judgment to go against it *unless* the plaintiff's prima facie case is held to be inadequate in law or fails to convince the factfinder.  It is this practical coercion which causes the *McDonnell Douglas* presumption to function as a means of "arranging the presentation of evidence," [cite omit.].
>
> If, on the other hand, the defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework-with its presumptions and burdens-is no longer relevant.  To resurrect it later, after the trier of fact has determined that what was "produced" to meet the burden of production is not credible, flies in the face of our holding

in *Burdine* that to rebut the presumption "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons."  450 U.S., at 254, 101 S.Ct. at 1094. The presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture.  *Id.,* at 255, 101 S.Ct., at 1094-1095.  The defendant's "production" (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven "that the defendant intentionally discriminated against [him]" because of his race, *id.,* at 253, 101 S.Ct., at 1093. The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.  Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, [fn omit.] and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is *required,*" 970 F.2d, at 493 (emphasis added).  But the Court of Appeals' holding that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff disregards the fundamental principle of Rule 301 that a presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the "ultimate burden of persuasion." [cites omit.]

*St. Mary's Honor*, 509 U.S. at 510-512.

Further, USPS' claim that George had an "overtly hostile and threatening attitude he displayed toward his supervisors," again is a postal defense, not an element of the *prima facie* case.  In fact it is not even a claim of "performance," but one of "conduct," which equally applies to his supervisors.  "Conduct" is outside the scope of USPS' argument.  "Conduct" is defined as

> *n.* Personal behavior, whether by action or inaction; the manner in which a person behaves.

Black's Law Dictionary, 7th ed., West Group, St. Paul, Mn. 1999, at 292.  The word, "performance" is defined as

> *n.* **1.** The successful completion of a contractual duty, usu. resulting in the performer's release from any past or future liability; EXECUTION (2). – Also termed full performance. *** **2.** The equitable doctrine by which acts consistent with an intention to fulfill an obligation are construed to be in fulfillment of that obligation, even if the party was silent on this point. **3.** A company's earnings. **4.** The ability of a corporation to maintain or increase earnings.

USPS claims of "performance deficiencies" are its articulated defense to George's claims.  Appropriate apportionment of the burdens to the parties cannot shift USPS' burden of persuasion with regard to its claim of George's poor performance.  And as shown elsewhere, even though it claims George was among the lowest 25% in

performance of all Merced carriers, it has not provided any comparative evidence that supports its assertion.  Even in the removal case, USPS has refused to provide the time "clock rings" for 24 March 2001, which would show that George did in fact clock off before the supervisor engaged him at the clock, then have another employee call the police.

As to George's claims of retaliation, the elements of its *prima facie* do not include an element of "satisfactory performance."  *Johnson v. Palma, supra*, 931 F.2d 203.

5. USPS' articulated reasons for its actions

For Case 1, USPS's articulated reason is that George was in violation of vehicle safety rules when a person backed out of a driveway into his parked postal vehicle. Even if we assume for sake of argument that George did violate a vehicle safety rule, USPS has not met its burden of persuasion as to its articulated reasons (and has not otherwise explained), why it engaged in the action of taking George's postal driver's license away and in further action requiring him to attend a special training course, when it did not do so for any other Merced postal employee who violated any vehicle safety rules, including carriers involved in accidents they caused while actually driving their postal vehicles. USPS "has failed to introduce evidence which, *taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor*, *supra*., 509 U.S. at 509  ("In that event, the court must award judgment to the plaintiff as a matter of law under Federal Rule of Civil Procedure 50(a)(1) (in the case of jury trials) or Federal Rule of Civil Procedure 52(c) (in the case of bench trials).")

USPS' articulated reason for its actions against George in Case 1 are further suspect, particularly, as described in Case 2 below, when George's supervisor intentionally violated vehicle safety rules the same day following George's request for official time to work on Case 1's vehicle safety issues, when the supervisor twice followed George on his route and the supervisor refused to correct a vehicle safety

1    violation the supervisor created).

2          For Case 2, even assuming it is normal for supervisors to monitor carriers out

3    on their routes and that George unsafely lifted a package, USPS has not explained why

4    (nor attempted to articulate any legitimate non-discriminatory reason for) Hoskins

5    violating vehicle safety rules when he stopped his vehicle in the middle of the street

6    and got out leaving the motor running so he could go question George about his lifting

7    practices.   USPS has not explained why (nor attempted to articulate any legitimate

8    non-discriminatory reason for), when George questioned Hoskins about leaving his

9    vehicle with the motor running in the middle of the street, Hoskins did not move it to

10   a safe position or at least shut off the motor as postal vehicle safety rules require.

11   USPS has not explained why (nor attempted to articulate any legitimate non-

12   discriminatory reason for), when George raised the issue back in the office of how

13   Hoskins unsafely left his vehicle, Hoskins then interrogated George to such an extent

14   that the stress caused by Hoskins interrogation caused George to be taken off work by

15   his doctor.  These are complained about actions of USPS which USPS has not rebutted

16   (*i.e.*, USPS has not articulated "legitimate" reasons for taking them).   More important,

17   USPS has not explained why Hoskins' several days of activities against George began

18   the very same day following George request for official time to work on an EEO case

19   involving a vehicle safety issue.   Merely articulating a "legitimate" reason to **part** of

20   an EEO claim does not satisfy USPS' burden of persuasion of legitimacy of its actions

21   as to the entirety of George's EEO claim.   *Burdine*, *supra*; *St. Mary's Honor*, *supra.*

22         Again, USPS has not articulated a "legitimate reason" for all of the actions

23   George has complained about, not only in "Case 2," but across his cases, and thus

24   "knows that its failure to introduce evidence of a nondiscriminatory reason will cause

25   judgment to go against it *unless* the plaintiff's prima facie case is held to be inadequate

26   in law or fails to convince the factfinder."  *St. Mary's Honor, supra.*

27         In USPS' motion asserting George "chose" to consolidate Case 4 and 5 into

28   Case 3 when he filed his formal complaint, USPS demonstrates just how confusing

to a *pro se* filer USPS' administrative handling of EEO case can be.  The facts are that USPS' EEO Counselor/Investigator, and not George, consolidated them in her 31 March 1998 "Notice of Final Interview" with notice of "right to file a formal complaint within 15 calendar days."  U.S. 0007660.  This notice was received by George on 20 April 1998.  U.S. 0007663.  The consolidation was so unusual to the *pro se* George and came without any instructions on how to proceed, that George's 1 May 1998 cover letter for his *pro se* formal complaint(s) had to explain how he had tried to prepare his complaint(s).  U.S. 0007652.  USPS' issue acceptance letter indicates all issues (Cases 3 through 5) would be referenced only by Agency No. 4F-956-0052-98.  U.S. 0007633-34.  It is apparent that the issues George raised in his 1 May 1998 cover letter were never clarified for George by his *pro se* filing of his First Amended Complaint with this Court, noting under "Case 3" the combining of the cases and his listing separately the other two as "Case 4" and "Case 5."  These three cases were treated administratively as a single case since prior to his filing of the formal complaint.

On 18 September 1997, George requested discovery from USPS in an administrative EEO case then pending before the Commission.  The request states:

> Please submit to us a record of the discipline which Carl Thornton has administered to his subordinates from 8/20/94 to present.  Also, please submit to us a record of all PS Form 4584's [14] issued to carriers in Merced; this, along with all corresponding corrective action(s) taken by management from 8/20/94 to present.  Specifically, we ask that all PS Form 4584's issued by Paul Tracy be included with the aforementioned plea for PS Form 4584's, and those issued to mail carrier Albert Cardenas of Merced.

U.S. 0007310-12.  USPS received the request on 22 September 1997.  On 13 October 1997, George wrote the EEOC requesting help in getting USPS to comply with his discovery request in that other case.  U.S. 0006160.  To date, the information has not been provided.  On 17 October 1997, George filed his formal complaint in Case No. 4F-956-0164-97.  U.S. 0006989.

---

[14]     The Postal "Observation of Driving Practices" form.

Within 5 days thereafter, the events of Cases 3-5 begin with an "excessive time" issue on 22 October 1997 with a letter of warning issued 29 October 1997, the lunch pail incident of 25 October 1997 with a letter of suspension issued 28 November 1997, and extensive office and street observation of George both in office  and on his route on 3 December 1997 with another letter of suspension issued on 10 December 1997.  U.S. 0005154-57.

On 27 October 1997, George filed his formal administrative complaint in Case 2, two days before the first letter of warning in this "Case 3" was issued.

During the 24 October 1997 investigative interview on the excessive time issue, George told the supervisor he would "like to review daily clock rings (DSIS)."  U.S. 0007598.  To date these clock rings have not been provided.  Also not provided is any data to compare that day's (22 October 1997) volume of mail against the normal volume and standard evaluated base times for delivery, so that a calculation can be made as to the actual Postal time required to deliver it.  George's formal complaint states:

> On Wednesday 10/22/97, I estimated two hours of overtime to complete C-35.  After I pulled down C-35 and was heading to the street, I saw Mr. Deleon by the CFS cages and I asked him about my two-hour estimate.  Mr. Deleon said the two-hour estimate was unacceptable.  He said he gave me one hour's office help and was approving one-hour overtime – "that's your two hours," he said.  I told him my two-hour estimate did not include the office help.  He said that was all he was approving.  When I asked what he wanted me to do if I can't make his estimate, Mr. Deleon told me to finish the route. ***

U.S. 0007642.  USPS has not articulated a reason for DeLeon's action of rejecting George's two hour estimate that day as "unacceptable," nor whether, giving the volume of mail that day, why only one additional hour of street time was sufficient to complete delivery, nor why DeLeon took the action to require George to finish the route before returning to the post office if DeLeon had given George an insufficient amount of time to deliver it.  As USPS asserts George went beyond the time allotted him, it is USPS' burden to articulate a "legitimate" reason for the time allotted George as sufficient for him to complete his street duties.  USPS' failure to disclose material evidence that would show whether or not DeLeon's taking back of the hour George

expected for his street time was consistent with normal street times for that volume of mail on route C-35 creates an inference that the withheld information would be favorable to George.  In light of the  failure of supervisors to accurately apply those standard evaluated times to the circumstances as described in other instances [Statement of Facts Nos. 3 through 5], it cannot be said that George did, in fact, exceed the standard evaluated time for delivery of route C-35 and that these supervisors were motivated by more than mere postal delivery requirements (*i.e.*, they were motivated by discrimination and/or reprisal) in their actions against George.

For the 25 October 1997 lunch pail incident, USPS has provided no specific postal rule concerning placing a lunch pail on a vehicle's delivery tray.  The delivery tray has enough space so that three trays of mail can be placed there.  According to George, at an earlier date on another route, the supervisor mentioned he wanted him to put his lunch pail down because there were trays of mail there and the pail was taking the place of one tray of mail.  George immediately complied.  The day of the incident, George was towards the end of this route with the lunch pail along with the remaining two trays of mail he had left to deliver on the delivery tray.  The supervisor came along and said that he had previously instructed George not to have that lunch pail on the delivery tray.  The supervisor would not let George explain.  Then the supervisor sternly said, what we have there is a carrier that doesn't know how to follow instructions, get that pail off that tray.  George immediately complied.  George Depo 282-286:12-23. [15]  While USPS asserts as its articulated reason that there is no dispute that George failed to follow the previous instruction, there is a real dispute about what George had been previously instructed to do.  That dispute of material facts is addressed at the "pretext" stage of the analysis for the trier of fact.  George believed he was following that prior instruction.  Further, USPS has not provided any information about other carriers who keep items on the delivery tray, nor any

---

[15]     Excerpts of cited Depo Transcripts are attached as Exhibits to the Wallace Declaration, and cited in the briefs to the actual page and line numbers appearing there.

information about what other carriers are told about keeping items on that tray.

The morning of 3 December 1997, George filled out a Form 3996 estimating need for time and/or assistance over the normal time, gave it to the supervisor, but it was not acceptable to the supervisor who told him to take the estimate back to his case and think about it, which George did and later resubmitted it, then the supervisor told him, that's it, I'm going out and I'm going to follow you.  George Depo 297-298:14-8. USPS has never articulated a "legitimate" non-discriminatory reason for its actions that on this day George's estimate was outside the normal standard evaluated times adjusted for the volume of mail needed to be delivered.  Addressing that issue is foundational to the subsequent actions of the day.

It should be noted that the events of 3 December 1997 occurred just one day after Supervisor Paul DeLeon submitted his EEO Affidavit in response to George's EEO Case No. 4F-956-0164-97 on 2 December 1997.  U.S. 0007586-88 [which states at U.S. 0007588, "Jody's performance in the office as well as on the street is very poor as documented by his DSIS [16] information, as a manager I use this information in addition to my observations to improve the performance of the operation I am in charge of."].  USPS has not provided any DSIS information that would corroborate or contradict DeLeon's assertion, whether in that case or another other case.  DeLeon stated: "On just about every instance in which I gave Jody instruction he would ask if I gave that instruction to others or he would be specific as to who else might be doing the same thing and asked if I had talked to them.  Jody does not demonstrate a willing attitude by his actions in the correction of his poor performance but rather seems to be interested in what I am telling other employees."  U.S. 0007588.  As indicated above with George's information requests before the EEOC, George tried every way to get information about similarly situated peers for his EEO cases, but USPS denied him that information.

---

[16]        USPS' computerized Delivery Services Information System (DSIS).

1    Paul Tracy's EEO affidavit in 4F-956-0164-97 was submitted on 19 November

2  1997, two weeks for the 3 December 1997 incidents.  U.S. 0006672.

3    On 3 December 1997, after telling George he was going to follow him, the

4  supervisor got a clipboard and watched George prepare to leave the post office, then

5  followed him out on the route.  George Depo 299:14-21.  George testified:

6         And there was, from what I remember, a lot of mail that day, circulars, just a lot of
         mail.  And so he noticed that I wasn't having the mail ready when I got to the box, and he
7         said that he instructed me to have the mail ready, that I remember anyway, and I said Lee,
         watch, just watch me and you'll see that just sometimes you just can't have the mail ready
8         by the time you get there 'cause there's so much mail, third bundles, you know, you got your
         flats and letters, DPS.

9

10  George Depo 299-300:22-5.   Again, the issue of this date revolves around the

11  supervisor initially rejecting George's request time for auxiliary assistance.  USPS has

12  not articulated, nor explained, whether George's time estimates about the amount of

13  mail that George had for delivery that day was within the standard evaluated time for

14  the Merced route adjusted for the volume of mail being delivered.  USPS has never

15  articulated whether the standard evaluated times include time in which carriers may

16  in engage in the normal deliveries of their routes for such activities as what George's

17  supervisors called his minor "time wasting" activities.  Though in their observations

18  of George, the two watching supervisors identified some minor "time wasting" issues

19  – such as not having the mail ready each and every time a carrier arrives at each one

20  of his numerous delivery mail boxes –  they have further not explained the amount of

21  lost time these observed practices used.   George has presented evidence of the

22  impossibility to have mail ready 100% of the time at each of the numerous mail boxes

23  on a carrier's delivery route and that at least 12 other carriers (the only ones he asked)

24  admit they do not have mail always ready when they arrive at the mail box.  U.S.

25  0005162.  This over-scrutinizing of George is also inconsistent with evidence he

26  gathered showing: a) 9 carriers admitting they had gone over the time estimated on

27  their Form 3996s (plus one who did not) with all but one of them indicating that they

28  were never disciplined for exceeding their estimates; and 12 carriers admitting they

do not always have their mail ready for delivery when they arrive at the house, with half indicating they had been told to have the mail ready.  U.S. 0005158-64.

Case 6 involves supervisor Matthew Rhoades issuing George three disciplines. The first two were issued on 22 November 2000 [a 7 day suspension for calling Rhoades a liar and hypocrite; and a letter of warning with two issues (the 23 October issue below, and an "excessive time" similar to issues discussed elsewhere)].  The third was a 7-14 day suspension issued 29 November 2000 [for George not signed the prior disciplines when Rhoades presented them to him on 22 November 2000].  As to the third (the 29 November 2009 notice of suspension), USPS rescinded it effective 9 March 2001 [Doc. 70-3, pp 66–67 of 78], but it is cited as a basis for the 9 April 2001 proposed removal action in Case 7 [U.S. 0006058].

On 23 October 2000, when Rhoades went to George for his Form 3996, George requested to see a union steward.  As a defense to its failure to let George see a union steward, USPS asserts supervisor "Rhoades agreed to give George the requested time."  Doc. 67 at 14 of 33 [numbered p. 8 by USPS], lines 24-26.  That assertion creates a genuine dispute of material facts, as George testified:

> I was requesting time to see a shop steward for not this particular incident of him being at my case, and he said that did I not see a shop steward on Saturday, which I guess was the 21st of October.  And I said yes, but that was for his concerns, not for my concerns.  I wanted to see a shop steward for my concerns.  And he goes, oh, he kind of raised his hands, smiled - - or his hand and clipboard I think, either one, and smiled, say you've got your union representation and kinda' smiled about it.
>
> No, that was for your concerns, I need to see a union rep for mine.  And he said no, that I already had gotten the time to see the union representative.  And then they kinda' went back and forth about that.  No, it wasn't, you told me that I would be able to see the union representative, but that you couldn't do it that day, that it would have to wait until Monday which that day was.  And we kinda' went back and forth like that.
>
> And I looked over Matthew Rhoades' shoulder and saw Postmaster Steven Tomlins sitting at the supervisor's desk, and Matthew told me that, you know, I just - - he says just you're not going to see a supervisor, just case your mail.  And I says but I asked you that it was for your concerns, not my concerns.
>
> And seeing the postmaster there and him - - or not him meaning Matthew Rhoades on how he was conducting himself, how he made light and laughed about my concern about seeing the shop steward, and how he gave me the time already; and me seeing the postmaster there, I went to him, to the postmaster to advise him, you know, to get him involved in the situation so that the matter could be settled there on the spot.

1    　　　　　And as I approached the Postmaster Steven Tomlins who was seated at supervisor's
2    desk, he, I guess, was observing the situation because he kinda' looked around me.  You
     know, I said - - I asked if I could see him a moment, speak to him a moment, and he just
3    looked at me, then looked over there to Matthew Rhodes, and he said your supervisor just
     gave you an instruction, I suggest you follow it.  I said yes, sir, went right back to the case.

4    George Depo 314-315:7-22.

5    　　　　　Not only does a material fact in dispute exist as to USPS articulated reason that

6    "Rhoades agreed to give George the requested time," USPS has not provided any

7    evidence that George received time with his union steward as requested.  A trier of

8    fact at the pretext stage could resolve that dispute against Rhoades' version, and,

9    thereby, find Rhoades violated postal policy.  Even if the rule is to follow "a lawful

10   order of your supervisor," then grieve it later, how could George properly grieve it

11   when he was being denied access to his union steward?  A trier of fact, could find that

12   Rhoades' order that prevented George from talking to Rhoades' superior, postmaster

13   Tomlins, who was sitting just a few feet away, so that the issue could be resolved was

14   also a violation of postal policy.  What is clear is that postmaster Tomlins had the

15   opportunity to provide prompt, curative and remedial action to prevent the retaliatory

16   actions of Rhoades, and neither he nor USPS did anything to stop it.

17   　　　　　The next day, 24 October 2000, "I was pulled in for - - to the front office for an

18   investigative interview of the incident that happened on the 23rd.  And after the

19   interview went back to casing mail ...."  George Depo 316:9-13.

20   　　　　　"And Matthew Rhoades came around.  Again after that initial interview up in

21   the front office he came down to get the estimates, and I asked again about to see a

22   union representative regarding my incident or the things that I still had not gotten time

23   to see a union representative about."  George Depo 316:16-21.

24   　　　　　"[M]y concern was that I wanted to see a union representative, but then I needed to let him
     know about the time it would take in additioin to whatever time I was asking due to the
25   route.  And that's - - it never did get settled whether or nor he was or wasn't going to allow
     the time, so I was just left hanging with what to put in my 3996."
26
     　　　　　"And so I started casing mail like he had wanted me to do, and then there was either
27   something like he had wanted me to do, and then there was either something about the mail,
     if he wanted me to take some mail, or something was unclear on what I needed direction on
28   as far as requesting time.  I had to know whether I was going to take some mail or leave
     some mail.  I don't exactly remember right now what it was but I had to ask him about it.

\*\*\*"

"And there was a situation where he called me in to the office, the front office and either on the 20th or the 21st - - I can't remember now - - where he was demanding some information . . . I think it was something about I didn't clock out on the street on a certain day."

George Depo 317-320:16-9. [17]

"Yes, we're still on the 24th.  That's when I went to the desk of Matthew Rhoades - - or supervisor's desk and Matthew Rhoades happened to be sitting there, and I asked him whatever it was, the concern it was that I had, that immediate concern whether or not to take mail or if he was or wasn't going to give me the time 'cause I had to put it on my 3996 to justify why I was asking for whatever time."

". . . but it was fresh in my mind about the investigative interview, how he had lied to me on the 23rd of October 2000 when he said that I got my union time, when he said he was going to give me union time for my concerns but he didn't because those concerns were his that I saw a union representative for on the 21st of October  2000 and also - -"

"Q.    Just so the record's clear, you're saying Matt Rhoades lied to you for giving you union time for your interest on the twenty - -"

"A.    Correct."

"Q.    - - first?"

"A.    Twenty - - or for my interests that were from a previous - - either on the 20th or the 15th of October some - - some other interests that had nothing to do with his concerns about that investigative interview."

"Q.    So you're saying that he lied - - although you were given union time, it was

---

[17]    After the 20 October 2000 interview, on 21 October 2000, Rhoades "called Ronnie DeAnda [union representative] and myself to have another investigative interview" over previous day's clocking out issue. George Depo 320:22-24. USPS did not give George time to talk with his union representative about any issues outside of the investigative interview.

"And I remember him asking about the clock-out time saying that you did not clock out to the street.  And I said yes, I did clock-out to the street.  And then he also mentioned about the incident where the - - the police were called on the 20th of October."  George Depo 321:12-16.  To date, USPS has not provided the time clock rings to support Rhoades assertion that George did not clock out to the street.  During the 21 October 2000 investigative interview, Rhoades explained to union representative DeAnda the police incident of 20 October 2000.  On 20 October 2000, after George had clocked off, Rhoades, then Ryan Anderson prevented George from talking to their superior (Paul DeLeon) about Rhoades' prior threat to George of discipline for going over a time estimate on a 3996, and the police were called when George attempted to see DeLeon about it.  George was already riding his bicycle off away from the post office when the police showed up.  USPS has not articulated a non-discriminatory reason why George could not talk to DeLeon, nor why Rhoades' and Anderson's efforts to prevent him exceeded George's rights to talk with their supervisor.  Other than in the investigative interview, George was not given any time with a union representative.  Along with other issues, these 20 & 21 October 2000 investigative interviews and the issues surrounding them are part of George's Administrative Case No. 4F-956-0044-01.

1  for his interests, not yours?"

2       "A.    Correct.  And so he - - so I - - that was fresh in my mind because that
investigative interview regarding that, and then also him being hypocritical because with
3  Ronnie DeAnda, the union representative, and then also with Sydney Brumfield, the union
representative, he's - - he composes or comports himself in such a nice fashion, and then
4  when I'm just me and him, it's just very aggressive and mean attitude, I guess.  I don't know
how to describe it right now but - -"

5

6  George Depo 329-331:16-2.

7       "And so the idea that he had lied to me about the union representation

8  time, that he said he was going to allow for my concerns and then didn't, and

9  then said I already gave you your time, that was fresh in my mind; and then also

10  the conduct of how he conducted himself with us in the investigative interviews

11  between when I had union representative and I was by myself, that was what

12  I thought was hypocritical.  And so that's when I just said that, I felt he was a

13  liar and a hypocrite."

14  George Depo 332:3-12.

15       After his statement to Rhoades, George returned to his case and continued

16  casing.  Within 7 minutes, Rhoades pulled George into the front office for another

17  investigative interview, this time it began with Rhoades' written statement "that you

18  called me a liar and a hypocrite and wanted to know why."  George Depo 332-33:18-

19  2.  As soon as Rhoades ended the investigative interview, the union steward Rhoades

20  brought in for it told George he should go and apologize to Rhoades, and the two of

21  them walked over to Rhoades and George apologized.  George Depo 336:5-15.

22       The 22 November 2000 Notice of 7-Day Suspension appears in Defendant's

23  exhibits, Doc. 70-2 at Pages 53-54 of 58.  Its first page states George called Rhoades

24  "a hypocrite and liar."   It charges him with violation of postal policy as follows:

25       Section 666.2 of the Employee & Labor Relations Manual states, "Employees are expected
to conduct themselves during and outside of working hours in a manner which reflects
26  favorably upon the Postal Service.  Although it is not the policy of the Postal Service to
interfere in the private lives of employees, it does require that Postal personnel be honest,
27  reliable, trustworthy, courteous and of good character and reputation.  Employees are
expected to maintain satisfactory personal habits so as not to be obnoxious or offensive to
28  other persons or to create unpleasant working conditions."

In George's mind, his statement was honest.  Rhoades knows an employee is entitled to union time.  On 23 October 2000, Rhoades broke into a smile when he said he had already given George union representation knowing full well that he was denying George union representation for issues not related to any prior union time granted.  Rhoades also knew he was continually denying George's 23 and 24 October 2000 requests for union time for these other issues.  Postmaster Tomlins who was present on the 23rd would not act.  Again, Rhoades (and Tomlins) gave George no union representation so that he could timely grieve his issues.  And, as discussed in the footnote above, on 20 October 2000, Rhoades and Anderson would not let George see their manager, Paul DeLeon.  Knowing all of this, how could Rhoades honestly be offended by George's statement.  It cannot be said that calling a supervisor to task in the only forum management would allow reflects disfavorably upon the Postal Service.  Out of frustration, George had no other timely and effective way to broach the issues directly, and he did that directly with Rhoades.  Abusive use of supervisory authority brings discredit to USPS, and it did nothing to address the issue.

USPS' articulated reasons for its actions for its 22 November 2000 suspension are "failure to follow instructions" and the making the statement that Rhoades is a liar and hypocrite.  USPS does not articulate a legitimate reason for Rhoades' arbitrary denial of George's request for union  representation on 23 and 24 October 2000.  A trier of fact could find that Rhoades' orders and actions were unreasonably arbitrary and contrary to postal policy so that the charge of "failure to follow instructions" was improper, and that Rhoades was acting in the manner that George stated.

The 29 November 2000 suspension concerns George allegedly calling Rhoades "tight" and a "tight wad" when Rhoades brought George to the front office to read the 22 November 2000 disciplines and also charges him with refusing to sign those disciplines.  On 22 November 2000, Rhoades and George were alone in the front office and Rhoades gave him the letters of suspension and warning concerning 23-24 October 2000 and 11 November 2002 to read.

When asked the meaning of the word "tight," George responded:

"Meaning being strict, I guess, or strict being that I can't - - it's - - huh - - it's hard to say. It's like, you know, the term, well, that's tight, you know, like how could you do something like that is what I was meaning by the word tight. Like it was - - like it was kind of this - - like how could you."

George Depo 340:4-9.

"*** I was just reading 'em like if I was reading this thing here and seeing something that wasn't right, you know, and - - or you know, as far as stating of the facts of something, and I recognized that the facts weren't right, I would, oh, man you're being tight, oh, that's really - - you're being a tightwad with this I - -"

George Depo 342:8-14.

"and you asked why I'm motivating it is what I was reading is I would read one, sit and sigh, then I'd read the other. Oh, can't believe how tight this thing is."

George Depo 343:10-13.

"A.    He didn't ask me to stop making comments about him being tight that I remember, he just said don't comment anymore."

"Q.    Okay.  About anything?"

"A.    About anything.  Just he wanted me just to silently sit there and read."

"Q.    But after that you continued to read and mutter to yourself that he was a tightwad?"

"A.    Yes.  I believe so."

"Q.    Then what happened?"

"A.    And I told him as such when he would say that."

"MS. WALLACE: I didn't hear you."

"THE WITNESS:  I told him as such.  I said I'm talking to myself.  So whether he could hear it or not, that's up to him, but I told him I was talking to myself."

George Depo 343-44:16-8.

A trier of fact could find that Rhoades instruction to George to read the two disciplinary letters meant that Rhoades wanted their full impact to be felt by George. George's actions while reading them demonstrates their impact on George.  Since George's reaction was not what Rhoades apparently had intended, he interrupted

George's reading of them. As discussed above, what is clear is that the factual matter (the 23 & 24 October 2000 incidents, and the 11 November 2000 "excessive time" incident) asserted in those letters is in dispute. The issuance of the 29 November 2000 letter of suspension over George's reading of the 22 November 2000 letters demonstrates the extreme to which Rhoades would go to attack George. USPS claims that on 19 March 2001, it rescinded this 29 November 2000 suspension effective 9 March 2001. Doc. 70-3, pp 66–67 of 78. If that is true, USPS has not articulated a legitimate reason for using it as a basis for the 9 April 2001 proposed removal.

Case 7 is the removal case and events surrounding it. The issues are discussed elsewhere in this brief and in Statement of Facts No. 4. Also see, U.S. 0005626-32. The removal is based on two charges.

The first charge relates to the ongoing charge George using "excessive time," this time on 21 March 2001. As Statement of Facts demonstrates, George actually used the amount of time within Merced's standard evaluated time for his route adjusted for the volume of mail he was required to deliver. As shown, George had mail to deliver that would require 3 hours and 44 minutes (3:44) of street time for him to deliver it. On 21 March 2001, his supervisor gave him less than one hour of street for that delivery, then charged him with use of "excessive time." In articulating its "legitimate" non-discriminatory reason for its action, USPS has not explained how George could deliver 3:44 hours of mail in less than an hour.

The second charge skips over the events of 22 and 23 March 2000, which includes an investigative interview into George's so-called use of "excessive" time on 21 March 2000 and his supervisor's outright denial of official time on 23 March 2000 necessary for George to respond to an EEOC Administrative Judge's 19 March 2000 letter (received by George on 22 March 2000) requiring his response in 4 pending EEO cases. USPS has never articulated any reason for its outright denial of EEO official time, though it is required to provide such time by 29 C.F.R. § 1614.605(b).

The second charge is on 24 March 2001, George engaged in "violence in the

workplace/conduct unbecoming a postal employee." The disputed factual issues are discussed in Statement of Facts No. 4 and as elsewhere discussed or referenced. A trier of fact could find that the supervisor telling George that he was indicating on a form 1017B that George had used "excessive time" that day was, as George took it, a threat of potential discipline. A trier of fact could find the supervisor abused his discretion by refusing George's request for a 3996 form (that the supervisor had at the desk he was sitting in) so that George could use the 3996 form to request time in the future to explain what the supervisor called "excessive time." A trier of fact could also find that when George went to the time clock some 30-40 feet away from the supervisor's desk and clocked out, George's repeated requests at the supervisor's desk for a 3996 had ended. A trier of fact could also find that by George thinking he left the supervisor at the supervisor's desk, then going to the time clock and clocking out, that George had intended to leave at that time. A trier of fact could also find, that the supervisor re-engaged George in discussions about a 3996 form after George had clocked out when, from behind George the supervisor surprised George by announcing his presence at the time clock and told George to leave or he was going to call the police. A trier of fact could find that supervisor Anderson's testimony, that "[t]o me, he was starting to try to antagonize me and trying to start something. That's what I felt he was doing. That's why I had to stand up and walk to the back - - that clock" [Anderson Depo 149:20-23] demonstrates Anderson's preconceived notion that George wanted to fight him and that Anderson walked into the foray, despite George leaving him.

Anderson testimony indicates:

"he got in my face, stuck his head right here. I looked down on him. He had his hands clenched like that and asked me what I was going to do about it. So - -"

"Q.    You felt at that moment he was trying to initiate a fight?"

"A.    Oh, yeah, I'm positive he did."

"Q.    He wanted you to throw the first punch - - oh?"

"A.    Yeah."

1

2

3

"Q.     - - or did you think he was going to throw the first punch?"

"A.     I think he wanted to throw a punch, but I think he wanted me to throw the first punch. He kept badgering me and antagonizing me. He was trying to get me to bite on fighting with him."

Anderson Depo 123:10-23. Later Anderson explained what George was doing, which explains what Anderson meant by "badgering me and antagonizing me," indicating George was babbling about more 3396s and something, and "'asking me, "Why are you being this way? Why are you doing this?"'" Anderson Depo 124:7-10. From Anderson testimony, a trier of fact could find that a reasonable person would not find that George had threatened Anderson with violence in the workplace, and that Anderson's assertion of fear that George was being a threat at that time is untenable and was unreasonable. What USPS does not say is that a local "Threat Assessment Team" was in place in 2001, with the specific response to incident requirements and training to assess what is or is not an actual threat in the workplace. **Wallace Dec. Exhibit 7**. USPS has provided no evidence that any Threat Assessment Team determined George's actions were a credible threat of violence to Anderson. The fact is that even with all Anderson said, he did reply to the question if he felt threatened by George, with "Not so much threatened. I felt more that if it continued, it would lead to something else pretty much." Anderson Depo 107-108:24-1. The failure of local management to use its own resources to determine the credibility of the threat alleged by Anderson and resolve it, demonstrates that something more than compliance with postal policy is at issue here in USPS' articulated reasons for its actions. In articulating its "legitimate" reasons for its actions, USPS avoids disclosing that it has been a long established postal policy that:

"The employee, upon request, will be provided a Form 3996, *Carrier – Auxiliary Control*, after the supervisor has been verbally informed as to the reason for the request. The employee shall not be denied the form and, upon request, a duplicate of the completed form will be provided the employee."

USPS Management of Delivery Services, Methods Handbook, Series M -39, § 122.33. **Wallace Dec. Exhibit 11**. USPS does admit the Anderson repeatedly refused to give

George a 3996 as he repeatedly requested.  We are not saying that George was the model employee who had no difficulties with management.  We are saying that the penalty of removal was unjustified and excessive.  If management wants employees to jump to its supervisors' commands, then supervisors cannot arbitrarily set for an employee delivery time limits that are radically less than the established evaluated route times, nor can supervisors arbitrarily deny an employee what postal policy grants the employee.  Even more important, USPS cannot permit its supervisors to outright deny an employee official time to work on an EEO case, as was done with George the day before the 24 March 2001 incident, when EEOC regulations specifically require USPS to grant the employee such time.

## IV. ARGUMENTS ON PRIVACY ACT VIOLATIONS AND SPOLIATION

### 1.   The Merced Files on Jody K. George

USPS cannot deny that George requested copies of all documents in the care, control or custody of any of its Merced management regarding George.  **Wallace Dec. Exhibit 5.**

### 2.   The DeLeon Files on Jody K. George

DeLeon declared in his declaration that George was in the bottom 25% of all Merced employees.  DeLeon Depo 19 February 2009 21:8-19.  DeLeon further testified at this deposition that documents existed at the time that would have supported this statement.  DeLeon Depo 19 February 2009 21-23:20-23.  When asked what DeLeon reviewed prior to his deposition, he stated that he had personal notes that he never provided to USPS' attorneys because he could not recall every being asked for them.  DeLeon Depo 19 February 2009 27-28:16-24; 29-30:5-8;30-32:24-17.  Based on DeLeon's deposition representation that he kept notes and disciplinary action files on Merced employees his deposition was continued so that these documents regarding not only George but the similarly situated employees could be produced.  DeLeon Depo 19 February 2009 32:10-18.

1    At his second deposition, DeLeon testified that he kept files on employees at

2    home.  DeLeon Depo 3 March 2009 23:11-24.

3    The Postal Service has an Employee Labor Relations Manual, the ELM.  ELM

4    Issue 12 [1 May 1989], Section 314.5.  Level 1  are those document necessary to

5    support employee staffing and other employment related functions. ELM 314.52a.

6    Level 2 are those documents regarding discussions, disciplines, any  official record

7    maintained for the purpose of enabling effective management of employees.  ELM

8    314.52b.  Level 3 are the personal notes and documents that are maintained by a

9    supervisor and never disclosed.  ELM 314.52c.

10   In general, DeLeon's personal files on George should have been considered

11   Level 3 [ELM 314.52(c) except that DeLeon took them home or he disclosed the

12   contents details in his affidavit, picking and choosing the information to be disclosed.

13   ELM 314.55.  This action made these Level 3 documents into Level 2 documents,

14   subject to the Privacy Act.  ELM 314.542.

15   DeLeon admits he took these records on George home or put them in some

16   storage area.   As ELM 314.55 NOTE indicates, if there is any doubt whether

17   particular notes may have been seen by or discussed with anyone other than the

18   subject employee, the doubt should be resolved in favor of treating them as official

19   Level 2 record.

20   ELM 12 was updated in 1998 to ELM 13 and those specific ELM provisions

21   remained the same.

22       3.    The Lack of Documentary Evidence to Support USPS' Defenses

23   It is axiomatic that no management employee will ever voluntarily  admit that

24   they discriminate or retaliate, but we do have an inference about DeLeon's state of

25   mind in his own words:

26       It is my belief that Jody is maliciously attacking Merced management and

27       grossly misusing the EEO process.

28   At this point, we know that DeLeon knew of George's EEO participation.  With that

knowledge, once DeLeon makes statements, he is under the absolute duty to retain supporting evidence or acts at his peril by either spoliation, exaggerating, or otherwise not safeguarding relevant evidence.

Spoliation of evidence is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation." *Kearney v. Foley & Lardner, LLP*, 566 F.3d 826, 838 (9th Cir. 2009) [citations omitted].

In *Clinton v. California Dept. of Corrections,* Slip Copy, 2009 WL 1308984 *2 (E.D.Cal.,2009), the court acknowledged the inherent power to address spoliation of relevant evidence for the failure to bring documents to a deposition, citing *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir.2006). The *Clinton* court correctly addressed that:

> A party may move for sanctions against another for failure to obey a court order and for intentional destruction of evidence. See Fed. R. Civ. Proc. 37, *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir.2006). As discussed above, available sanctions include monetary and/or non-monetary sanctions, such as an adverse inference jury instruction, striking a claim or defense, excluding evidence from trial, and default or dismissal. See, e.g ., Rule 37(b)(2). District courts have broad discretion in imposing discovery sanctions as part of their inherent power. See *Anheuser-Busch, Inc. v. Natural Beverage Distrib.*, 69 F.3d 337, 348 (9th Cir.1995).

> The destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation is referred to as spoliation. See *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir.2001). "The intentional destruction of evidence relevant to an issue at trial can ... support an inference that the evidence would have been unfavorable to the party that destroyed the evidence." *Ritchie v. United States*, 451 F.3d 1019 1024 (9th Cir.2006).

> "Courts have inherent equitable powers to dismiss actions or enter default judgments for failure to prosecute, contempt of court, or abusive litigation practices." *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 916 (9th Cir.1987). However, prior to the imposition of sanctions for destroying evidence, the party destroying the evidence has to be under a duty to preserve the evidence. See *Kronisch v. United States*, 150 F.3d 112, 126 (2nd Cir.1998). "This obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation ...." *Id.*

*Clinton, supra*, 2009 WL 1308984  at *8.

Whether the failure to preserve the supporting evidence was the failure to DeLeon or any other Postal employee is irrelevant once it knew of the EEO complaints. To now permit USPS to use mere allegations without the supporting

evidence that it only had care, control or custody over is a reckless act in violation of its own policies to retain evidence in support of its defenses.   For example, see **Wallace Dec. Exhibit 9**.

4.    The DeLeon Files Violate The Privacy Act But Even If DeLeon's Files Do Not Violate The Privacy Act They Were Part of a System of Records That Needed to Be Preserved

Once DeLeon removed all his documents on George, and failed to properly secure them and keep them absolutely confidential, the Privacy Act applies.  More importantly, DeLeon created a system of records that are imputed to the Postal Service based on his supervisory authority over George. More importantly, this system of records are relevant to this case as supporting documentation to each of USPS' defenses to George's claims.

The Privacy Act generally prohibits an agency from disclosing any record, contained in a system of records, to another person or agency except upon the written request or with the written consent of the individual to whom the record pertains.  5 U.S.C.A. § 552a(b).  Congress enacted the Privacy Act to "provide certain safeguards for an individual against an invasion of personal privacy," by requiring governmental agencies to maintain accurate records and providing individuals with more control over the gathering, dissemination, and accuracy of agency information about themselves.  Pub.L. No. 93-579, § 2(b), 88 Stat. 1896, 1896 (1974).

To accomplish this purpose, the Privacy Act sets forth conditions for disclosure of private information and precludes an agency from disclosing information in its files to any person or to another agency without the prior written consent of the individual to whom the information pertains, 5 U.S.C. § 552a(b), unless the documents fit within the routine use exception. 5 U.S.C. § 552a(b)(3).

Although the term "disclosure" is not defined by the Act, courts have defined the term as the imparting of information, which itself has meaning, to a person who was previously unaware of it. *Harper v. U. S.*, 423 F. Supp. 192, 197 (D.C. S.C.

1976) ["While the Act does not specifically define the term "disclosure," common sense requires that this term be taken to denote the imparting of information which in itself has meaning and which was previously unknown to the person to whom it is imparted.  Defendants submit that the letters in issue in the present action cannot plausibly have resulted in any such disclosure.  As an analysis of these letters, *supra*, reveals, they contain no information about plaintiff which could reasonably lead to anything other than idle speculation."]; *Federal Deposit Ins. Corp. v. Dye*, 642 F.2d 833, 836 (5th Cir. 1981) ["A dissemination of information to a person or persons who were previously aware of the information is not a disclosure under the Privacy Act. *Harper v. United States*, 423 F.Supp. 192 (D.S.C. 1976).  Moreover, the release of public information to the same "public" is not a disclosure.  *King v. Califano*, 471 F.Supp. 180 (D.D.C. 1979)."];   *King v. Califano*, 471 F. Supp. 180, 181 (D.D.C. 1979) ["The term "record," as defined for purposes of the Act, means a tangible or documentary record (as opposed to a record contained in someone's memory) and has a broader meaning than the term commonly has when used in connection with record-keeping systems."].

     The term "disclosure" includes virtually all unauthorized transmissions of protected records, regardless of the recipient's prior familiarity with it.  An agency's unauthorized release of a protected record constitutes a disclosure under the Privacy Act unless the record merely reflects information that the agency has previously and lawfully disseminated outside the agency to a recipient who is fully able to reconstruct its material contents.  As an example, the Department of Justice was not entitled to summary judgment on a complaint that the agency violated the plaintiff's rights under the Privacy Act when one of its employees faxed a confidential memorandum to a former agency employee, who passed it on to a reporter.  The release was a disclosure even though the former employee previously had come into contact with the information in the course of his duties.  Additionally, even under a more restrictive interpretation of "disclosure," the agency would be required to establish that the

former employee remembered and could reconstruct the document's material contents in detail at the time he received it.  *Pilon v. U.S. Dept. of Justice*, 73 F.3d 1111 (D.C. Cir. 1996).   In *Pilon*, plaintiffs never had personal access to the underlying information that was disclosed by a DOJ employee to the newspapers.   Because Pilons' attorney had a security clearance to permit him access to the underlying documents, the Pilons were able to respond to the derogatory information in sufficient detail that resulted in a *de novo* review by the Attorney General and full reinstatement. There were other disclosures regarding the investigation and recision, including an unauthorized communication to a private attorney who disseminated the document to the new media.   The court refused to be manipulated by "neat legal maneuvers" to circumvent the Privacy Act.  *Id.*  at 1118.

Going one step further, the *Pilon* court, citing *Tijerina v. Walters,* 821 F.2d 789 (D.C.Cir.1987), did not accept the government invoking a provision that allows an agency to exempt a system of records from certain requirements of the Privacy Act, 5 U.S.C. § 552a(j), as authority for exempting the records entirely from the Act's civil liability provisions.  "We rejected that interpretation, reasoning:

> The Act's statutory language, framework, and legislative history persuade us that the government is urging a completely anomalous use of the exemption provision that makes the Act a foolishness. The interpretation offered by the government would give agencies license to defang completely the strict limitations on disclosure that Congress intended to impose. We cannot agree that at the same time it forbade agencies to exempt systems of records from disclosure requirements, Congress intended them to be able to elude civil liability at their caprice. Agency exemption from civil liability is not in keeping with the language of the Act, and it serves none of the purposes behind the exemptions provision or the Act as a whole.

*Pilon,* 73 F.3d at 1119.  The *Pilon* court refused the Department's narrow construction of "disclose" to shield the agency from liability because the Privacy Act's framework never contemplated  that after reviewing the document under one of the exceptions, the employer  may on a whim once again retrieve it from the agency's secured files and use it for whatever purposes he wishes.  In *Pilon*, the court specifically address that it rejected "the Department's interpretation of 'disclose,' once in possession of the document for the second time, that same employee could resign his position with the

1  agency, take the document with him, and (as a private citizen) release the document
2  broadly without anyone incurring liability under the Privacy Act." 73 F.3d at 1122-
3  23. That is exactly what happened with George when DeLeon retained the documents
4  for his own personal use for whatever purposes he wishes because he has the
5  documents in his personal possession.

6  ## V.   CONCLUSION

7  For the reasons stated in George's opposition, Defendant's motion for summary
8  judgment should be denied.

10  DATED:     24 August 2009

11                                         LAW OFFICES OF ELAINE W. WALLACE

13                                    by     /s/
14                                            ELAINE W. WALLACE
15                                            Attorneys for Jody George