# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JODY K. GEORGE, | 1:03cv06052 DLB |
| Plaintiff, | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | (Document 66) |
| JOHN E. POTTER; and UNITED STATES POSTAL SERVICE, | |
| Defendants. | |

Defendants John E. Potter and United States Postal Service ("Defendants" or "USPS") filed the instant motion for summary judgment on July 27, 2009.  The matter was heard on November 20, 2009, before the Honorable Dennis L. Beck, United States Magistrate Judge. Sylvia Quast, Assistant United States Attorney, appeared on behalf of Defendants.  Elaine W. Wallace appeared on behalf of Plaintiff Jody K. George ("Plaintiff" or "George").

## PROCEDURAL BACKGROUND

Plaintiff, initially proceeding pro se, filed the instant action on August 4, 2003.  On June 8, 2004, Plaintiff filed a First Amended Complaint alleging (1) discrimination based on race (white) and sex (male); and (2) retaliation for seven complaints ("Cases") filed with the Equal Employment Opportunity Commission ("EEOC").  Plaintiff also alleged that the conduct in each complaint to the EEOC, when taken together, created a hostile work environment.

On July 27, 2009, Defendants filed the instant motion for summary judgment.

1   Defendants argue that: (1) the Court lacks jurisdiction over Plaintiff's hostile work environment

2   claim because he failed to administratively exhaust it; (2) Plaintiff cannot establish a prima facie

3   case of discrimination in any of his EEOC Cases; and (3) Defendant USPS undertook all of the

4   challenged actions for legitimate business-related reasons and not out of an impermissible

5   discriminatory or retaliatory motive.

6       Plaintiff opposed the summary judgment motion on August 29, 2009.  Defendants filed

7   their reply on October 2, 2009.

8       On October 7, 2009, the Court continued the hearing on Defendants' motion because

9   Plaintiff's opposition was partially deficient.  The Court ordered Plaintiff to file a response to

10  Defendants' Statement of Undisputed Material Facts in compliance with then Local Rule

11  56-260(b).  Defendants also were permitted leave to reply.

12      On October 27, 2009, Plaintiff filed "Admissions and Denials of Defendant's Statement

13  of Undisputed Facts", a separate "Statement of Disputed Facts in Response to Defendant's

14  Statement of Undisputed Facts," the Supplemental Declaration of Elaine W. Wallace and

15  supporting exhibits.

16      On November 6, 2009, Defendants filed a response, along with the supporting declaration

17  of Steve Tomlins, Postmaster of Turlock, California.

18                          **FACTUAL SUMMARY**

19      In 1979, the USPS hired Jody George, a white male, and in 1982, he became a full-time

20  mail carrier in the Merced Post Office.  USPS' Statement of Undisputed Facts ("SUF") 1.  In

21  approximately 1994 or 1995, George became a "T-6," which is a carrier that delivers the regular

22  routes of others on their days off.  He remained in this position, except for a brief period in 2000,

23  until he was removed in 2001.  SUF 2.

24      For much of the time after he became a T-6, George would submit requests (also known

25  as Form 3996s) for overtime or the assistance of others to complete his work at least three times

26  a week, even requesting it daily during some periods.  SUF 3.  Carriers receive time-and-a-half

27  pay for the first two hours of overtime, and double time if they work more than ten hours.  SUF

28  4.

                                    2

George's supervisors characterized him as performing in the bottom 25% of carriers in the Merced Post Office because of his inefficient mail-handling and time-wasting practices.  SUF 5. Other carriers would complain about having to do George's work for him, and Merced Post Office supervisors would have to reschedule other carriers' work and spend overtime to "bail out" George by helping him complete his routes.  SUF 6.

George knew that his supervisors at the Merced Post Office felt that he worked too slowly.  SUF 7; Deposition of Jody George ("George Dep.") 46:7-15.  The supervisors at the Merced Post Office tried various ways to improve his performance and get George to change his inefficient practices, including direct personal instruction and counseling, training by other individual carriers, and collaborative efforts with the union to help him correct inefficiencies. SUF 8.  Postmaster Paul Tracy even dismissed all disciplinary actions against George prior to 2000 and removed them from George's personnel file because Tracy thought that if George wasn't upset about such actions, he might perform better.  SUF 9.

George's supervisors were concerned about George being a threat to others including themselves, with Tracy even checking his mirror when going home.  SUF 10.  George's supervisors called the police in November 1999, and again in October 2000, when he disobeyed orders to leave the premises after he clocked out, and they issued him at least one 14-day suspension for this conduct.  SUF 11.

The EEOC did not find that the USPS had discriminated or retaliated against George in any of his EEOC Cases.   SUF 12.

CASE 1: 1996 Vehicle Accident (USPS Claim No. 4F-956-0069-97)

While George was delivering mail on October 10, 1996, a person backing out of her driveway hit George's postal vehicle as he was parked in front of her residence.  SUF 13.  Carl Thornton, a white male supervisor at the Merced Post Office, came out to investigate the accident, talked to George, and determined that George had parked his vehicle such that it was blocking the woman's driveway.  SUF 14.  On October 30, 1996, Thornton issued a notice of a 7-day suspension to George for failing to operate his postal vehicle in a safe manner, which George grieved and the USPS reduced to a letter of warning to be kept in his personnel file for

one year on January 2, 1997.  SUF 15.

Less than a month prior to the October 10, 1996, vehicle accident, George had received a letter of warning for failing to operate his vehicle in a safe manner.  SUF 16.  George had also had two other accidents with USPS vehicles in the 1993-94 timeframe, one in which he skidded into a mailbox and another in which he dented the top of the vehicle by driving under a low-hanging tree limb.  SUF 17.

After a hearing, the EEO denied George's complaint about the notice of suspension.  SUF 19.  George engaged in EEO activity at least five times in the year following the letter of warning.  SUF 18.

CASE 2:  1997 Street observation and lifting technique instruction (USPS Claim No. 4F-956-0177-97)

George alleges that after he requested time to do an EEO affidavit on June 9, 1997, his supervisor, Leroy Hoskins, a Hispanic male, followed him while he was delivering mail and talked to him about his lifting technique.  He also complained that Hoskins questioned him on June 11, 1997, about how much time it took to deliver his route on June 9, 1997.  George acknowledges that street observation by supervisors is part of their normal duties and that he didn't use proper lifting technique with a parcel on June 9, 1997.  SUF 20.  George did not receive any discipline in connection with these events.  SUF 21; George Dep. 250:21-251:13.

After a hearing, the EEOC denied George's complaint.  SUF 22.

CASE 3:  1997 use of unauthorized overtime (USPS Claim No. 4F-956-0052-98)

On October 22, 1997, George told Paul DeLeon, a Hispanic male supervisor in the Merced Post Office, that he would need two hours of overtime to carry his route, and DeLeon responded by approving one hour of overtime and giving George another hour of help in the office to prepare for carrying his route.  SUF 23; Exhibit 3 to Supplemental Declaration of Elaine Wallace ("Wallace Supp. Dec."), at US 5155 .  George used 2 hours and 35 minutes of overtime on October 22, 1997.  SUF 24.

On October 28, 1997, Leroy Hoskins issued a letter of warning to George for failing to follow DeLeon's instructions and working unauthorized overtime on October 22, 1997.  After

George filed a grievance, the letter was reduced to documented instructions on February 24, 1998, and was subsequently removed from his file altogether.  SUF 25.

After a hearing, the EEOC denied George's complaint.  SUF 26.

CASE 4 : 1997 failing to follow instruction about use of mail delivery tray (consolidated with 3 and 5 when filed formal EEOC charge) (USPS Claim No. 4F-956-0063-98)

On October 25, 1997, DeLeon observed George while George was delivering mail and noted that George had placed a cooler, which served as his lunch pail, on the mail delivery tray next to him in his vehicle, even though DeLeon had previously told him not to do so because it was taking up space that should be occupied by mail.  SUF 27; Exhibit 3 to Wallace Supp. Dec., at US 5155.

On November 25, 1997, DeLeon issued a notice of a 7-day suspension to George for failing to follow instructions. SUF 28.

After a hearing, the EEOC denied George's complaint.  SUF 29.

CASE 5:  1997 failing to follow instructions about time-wasting practices (USPS Claim No. 4F-956-0070-98)

On December 3, 1997, after George requested approximately three hours of overtime to deliver his route, Hoskins observed that, despite being previously instructed to have mail ready for delivery when George arrived at a house and to avoid backtracking, George did not have his mail ready at several deliveries and backtracked.  SUF 30; Exhibit 3 to Wallace Supp. Dec., at US 5155-56.  Hoskins issued George a notice of a 14-day suspension for the incident.  SUF 31.

After a hearing, the EEOC denied George's complaint.  SUF 32.

CASE 6:  2000 use of unauthorized overtime and calling supervisor names (USPS Claim No. 4F-956-0162-01)

On October 23, 2000, Matthew Rhoades, a white male supervisor in the Merced Post Office, following standard procedure, requested that George provide a Form 3996 estimating how much overtime or auxiliary assistance George would need that day, to which George responded by asking for time to see his union representative.  SUF 33.  Rhoades agreed to give George the requested time, but then they started to argue over when George would take that time, with Rhoades finally telling George to return to casing his mail. Instead, George went to complain to

the postmaster.  SUF 34.

On or about November 11, 2000,[1] George requested that Rhoades authorize 4 hours and 40 minutes of overtime or assistance to complete his route; Rhoades gave him more time than he requested, but George took almost two hours more than authorized, incurring penalty overtime (i.e. work for which George would be paid double time) and missing the last dispatch of outgoing mail.  SUF 35.

On November 22, 2000, Rhoades issued George a letter of warning for the October 23 and the November 11 incidents.  SUF 36.

On October 24, 2000, Rhoades asked George to provide an estimate of how much overtime or auxiliary assistance George would need, to which George responded by asking for time to see his union representative, and the two fell into another argument.  SUF 37.

On October 24, 2000, Rhoades instructed George to case his mail, but a few minutes later, George left his case, and approached Rhoades' desk to bring up the overtime issue again.  Rhoades reiterated his instruction that George case his mail; in response, George called Rhoades a "hypocrite" and a "liar" in front of other employees on the workroom floor.  SUF 38; George Dep. 332:15-16.

On November 22, 2000, Rhoades issued George a notice of a 7-day suspension in which there was no time actually off work or pay deducted for the incident.  George grieved the notice and it was reduced to a letter of warning on March 19, 2001.  SUF 39.

On November 22, 2000, Rhoades and George met regarding the letter of warning and the suspension notice, and while George was reading the documents, he repeatedly told Rhoades he was being "tight" and a "tightwad," even after he was asked to stop.  SUF 40; George Dep. 342:15-22; 343:14-24.

On November 29, 2000, Rhoades issued a notice of a 7-day paper suspension to George in connection with George's behavior at the meeting on November 22.  George grieved this notice

---

[1]Plaintiff claims the correct date is November 13, 2000.  Defendants do not dispute Plaintiff's assertion, deeming it immaterial.

and it was rescinded on March 19, 2001.  SUF 41.

George engaged in EEO activity at least twice in the four months following the letters of warning.  SUF 42.

The EEOC denied George's complaint about the letter of warning and the two notices of suspension.  SUF 43.

CASE 7:  2001 removal (USPS Claim No. 4F-956-0150-01)

In January, February, and March 2001, George continued to work unauthorized overtime, resulting in two paper suspensions of 14 days.  SUF 44.

On March 21, 2001, George requested that Rhoades grant him almost five hours of overtime or auxiliary assistance to deliver his route, but Rhoades only granted him 2 hours and 45 minutes.  George did not return until three hours after Rhoades told him to be back, resulting in more unauthorized overtime.  SUF 45.

On Saturday, March 24, 2001, George requested and was approved for overtime or assistance to complete his route, but once again decided he would need overtime beyond what he had originally requested and been authorized to use.  SUF 46.

Supervisor Ryan Anderson, a white male, came out to where George was delivering mail and told George that he wanted him back to the post office by 5:30, when the last truck was supposed to leave with all of the outgoing mail.  SUF 47.

George claims he pulled into the parking lot at approximately 5:30, went inside and picked up two Form 3996s to request more overtime, and Anderson told him to clock out and go.  SUF 48; George Dep. 380-381:12.  Anderson told George that he was not going to give him another Form 3996 then, to which George responded by asking for yet another Form 3996.  SUF 49.

Anderson again instructed him to leave, but George did not, even though Anderson repeated his instruction to leave several times.  George "just lost it. I thought – I just set my lunch pail down on the floor and I says, if I don't leave, what are you going to do about it."  Anderson continued to insist that George leave, repeating his instruction at least five times, and the two were about a foot apart when George said to him "if I don't leave, what are you going to do about it."  Anderson said he would call the police.  SUF 51.

1   George and Anderson went out to the back dock, and then Anderson went back into the

2   post office to wait for the police.  George waited on the back dock for a minute or two, and then

3   went back into the facility, where Anderson saw him, asked him what he was doing, and again

4   instructed him to leave approximately another 10 or 15 times, with George following him around

5   the facility.  SUF 52.  Despite Anderson's repeated instructions to leave the premises, George was

6   still in the facility when the police arrived.  SUF 53.

7   George walked out with a police officer, started to go home, but then went back to the

8   post office and rang the doorbell on the back dock. The police told him to go home again and he

9   finally left for good.  SUF 54.

10   On the morning of Monday, March 26, 2001, Rhoades notified George that he was being

11   placed in emergency off-duty status as a result of the incident with Anderson.  SUF 55.  On April

12   9, 2001, Rhoades issued George a Notice of Proposed Removal.  SUF 56.  Postmaster Steve

13   Tomlins removed George as a USPS employee effective May 10, 2001.  SUF 57.

14   The EEOC granted summary judgment to the USPS on George's complaint regarding the

15   emergency suspension and the removal.  SUF 58.

16   ## SUMMARY JUDGMENT STANDARD

17   Summary judgment is appropriate when no genuine issue of material fact exists and the

18   moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317

19   (1986).  "If the party moving for summary judgment meets its initial burden of identifying for the

20   court those portions of the material on file that it believes demonstrates the absence of any

21   genuine issues of material fact," the burden of production shifts and "the non moving party must

22   set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a

23   genuine issue for trial.'"  T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626,

24   630 (9th Cir. 1987) (quoting Fed. R. Civ. P. 56(e)).  As to the specific facts offered by the

25   nonmoving party, the court does not weigh conflicting evidence, but draws all inferences in the

26   light most favorable to the nonmoving party.  Id. at 630-31.

27   If the moving party meets its initial responsibility, the burden then shifts to the opposing

28   party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings,

but is required to tender evidence of specific facts in the form of affidavits, and/or admissible

discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e);

Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in

contention is material, i.e., a fact that might affect the outcome of the suit under the governing

law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., 809 F.2d at

630, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a

verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir.

1987).  In the endeavor to establish the existence of a factual dispute, the opposing party need not

establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

trial."  T.W. Elec. Serv., 809 F.2d at 631.

       In resolving the summary judgment motion, the court examines the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

Civ. P. 56(c).  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255,

and all reasonable inferences that may be drawn from the facts placed before the court must be

drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v.

Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam).  Nevertheless, inferences are not drawn out

of the air, and it is the opposing party's obligation to produce a factual predicate from which the

inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F.Supp. 1224, 1244-45 (E.D.

Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

       Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

1
**DISCUSSION**[2]

2
I.      Failure to Produce Discovery

3
        Throughout his opposition papers, Plaintiff claims that Defendants failed to produce a

4
variety of requested discovery.  Plaintiff appears to seek denial of the summary judgment motion

5
because he does not have documents that relate to facts in issue.  However, a party seeking denial

6
(or continuance) of a summary judgment motion based on a need for discovery is required to file a

7
motion under Fed. R. Civ. P. 56(f).  Brae Transp., Inc. v. Coopers & Lybrand, 790 F.2d 1439,

8
1443 (9th Cir. 1986) ("References in memoranda and declarations to a need for discovery do not

9
qualify as motions under Rule 56(f).").  The party must demonstrate that there are specific facts he

10
hopes to discover that will raise an issue of material fact.  Harris v. Duty Free Shippers Ltd.

11
Partnership, 940 F.2d 1272, 1276 (9th Cir. 1991).  "The burden is on the party seeking to conduct

12
additional discovery to put forth sufficient facts to show that the evidence sought exists." Volk v.

13
D.A. Davidson & Co., 816 F.2d 1406, 1416 (9th Cir. 1987).

14
        Here, Plaintiff has not filed a motion under Fed. R. Civ. P. 56(f) or set forth facts

15
demonstrating that the requested discovery exists.  Plaintiff also does not contradict Defendants'

16
assertion that they produced over 11,000 pages of documents and allowed Plaintiff to depose any

17
USPS employee that he wanted during the six years that this litigation has been pending.  Further,

18
the docket reflects that the Scheduling Order and related discovery dates were extended repeatedly

19
between July 2005 and September 2008.  In September 2008, the Court extended the

20
non-dispositive motion cut-off to June 2, 2009.  At that time, the Court took Plaintiff's pending

21
discovery motions off-calendar "with (sic) prejudice to refiling consistent with the new

22
non-dispositive motion deadline."  Plaintiff did not pursue additional discovery and failed to

23
renew or file any non-dispositive motions before the deadline.  Accordingly, the Court disregards

24
Plaintiff's assertions related to Defendants' alleged failure to produce requested discovery as

25

26          [2]The Court has reviewed Plaintiffs' amended complaint, the motion for summary judgment, the opposition,
27    and the reply.  The Court declines to exhaustively list every argument forwarded, every fact recited, and every piece
    of evidence submitted by the parties.  Omission in this order of reference to various arguments, facts, or evidence
28    should not be interpreted by the parties as an indication that the Court overlooked that argument, fact, or piece of
    evidence.

1   untimely, procedurally improper and without support.

2   II.      Failure to Exhaust Administrative Remedies - Hostile Work Environment Claim

3            Defendants contend that the Court lacks jurisdiction over Plaintiff's hostile work

4   environment claim because he failed to exhaust his administrative remedies.  A plaintiff must

5   exhaust his administrative remedies to bring a Title VII claim in district court.  Sommatino v.

6   United States, 255 F.3d 704, 707 (9th Cir. 2001).  Substantial compliance with the presentment of

7   discrimination complaints is a jurisdictional prerequisite.  Id. at 708.  The district court has

8   jurisdiction over any charges of discrimination that are "like or reasonably related" to the

9   allegations in the EEOC charge, or that fall within the "EEOC investigation which can reasonably

10  be expected to grow out [of] the charge of discrimination."  Id. (citations omitted).  A federal

11  court may not consider allegations concerning hostile work environment not contained in an

12  EEOC charge.  See, e.g., Mathirampuzha v. Potter, 548 F.3d 70 (2d Cir. 2008) (plaintiff failed to

13  comply with exhaustion requirement as EEO filing did not give the Postal Service "adequate

14  notice" nor contain the "factual underpinnings" of a hostile work environment claim).

15           Here, Plaintiff does not direct the Court to any EEOC Case or complaint in which he

16  asserted allegations of a hostile work environment.  The seven EEOC Cases at issue refer to

17  discrete events, which involved different supervisors and were widely separated in time, and did

18  not involve verbal or physical conduct of a racial or sexual nature or incidents that were

19  sufficiently severe or pervasive to create an abusive work environment.  Vasquez v. County of Los

20  Angeles, 349 F.3d 634, 642 (9th Cir. 2003) ("To prevail on a hostile workplace claim premised on

21  either race or sex, a plaintiff must show: (1) that he was subjected to verbal or physical conduct of

22  a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was

23  sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an

24  abusive work environment."); Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993) (Title VII is

25  violated when the workplace is permeated with discriminatory intimidation, ridicule and insult

26  that is sufficiently sever or pervasive to alter the conditions of the victim's employment and create

27  an abusive working environment).

28           Although Plaintiff reportedly filed "some 25 EEO cases over 5 ½ years," the sheer volume

11

1   of those complaints is not sufficient to place Defendants on notice of a hostile work environment

2   claim.  Plaintiff's multiple EEO filings did not give Defendants adequate notice or contain the

3   factual underpinnings of a hostile work environment claim.  Mathirampuzha, 548 F.3d at 77.

4   Further, the multiple cases could not "reasonably be expected to blossom into an investigation

5   covering allegations of unrelated conduct ... dating back several years."  Id. at 76.  It also appears

6   that Plaintiff did not pursue the bulk of his approximately 25 administrative cases.

7       Plaintiff contends that the non-exclusive test for a hostile work environment is whether the

8   conduct unreasonably interfered with the employee's work performance.  Harris. 510 U.S. at

9   25-26; Opposition, pp. 11-13.  He argues that all of his claims are of management conduct that

10  have unreasonably interfered with his work performance and that have made it impossible to do

11  the job.  As Defendants properly point out, Plaintiff has cited the concurring opinion in Harris, not

12  the majority's view regarding hostile work environment.  Regardless, Plaintiff has not provided

13  any evidence that he raised concerns in his administrative complaints that management engaged in

14  actions that made it impossible for him to do his job.

15      The Court notes that Plaintiff asserted in Case 2 that he had to go out on stress leave due to

16  the action of Defendants.  Opposition, p. 6; Exhibit 1 to Declaration of Elaine Wallace at US

17  7253-55.  At issue in Case 2 were observations by his supervisors, discussion about his lifting

18  technique and questioning regarding the performance of his job.  However, Plaintiff did not

19  receive any discipline in connection with these events.  He also admitted that street observation by

20  supervisors is part of their normal duties and that he did not use proper lifting techniques.  As

21  such, the actions complained of do not raise an inference that management was interfering with

22  his work performance or that the actions would reasonably be perceived as hostile or abusive.

23  Harris, 510 U.S. at 22.

24      To further establish a hostile work environment claim, Plaintiff argues that management

25  held him to time standards on routes that were shorter than the normal evaluated times, which

26  altered working conditions and made it more difficult to do his job.  Opposition, p. 11.  Plaintiff

27  relies on an April 1998 route evaluation to dispute whether he exceeded established route times.

28  Plaintiff's Statement of Undisputed Facts, ¶ 2.  Plaintiff has failed to demonstrate that the April

12

1  1998 route evaluation is applicable to his EEOC cases involving the use of unauthorized overtime

2  in October 1997 (Case 3), October and November 2000 (Case 6), and in January, February and

3  March 2001 (Case 7).

4  Plaintiff repeatedly takes issue with Defendants' alleged failure to conduct required route

5  counts, arguing that Defendants purposely kept the routes out of adjustment.  Exhibits 4 and 5 to

6  Wallace Dec.; Deposition of Steve Tomlins 46:14-19.  However, it appears that the postal

7  handbook versions cited by Plaintiff are obsolete (a version of the M-41 handbook and M-39) and

8  USPS released an updated version of the M-41 handbook in March 1998, which is now operative.

9  Declaration of Steve Tomlins ("Tomlins Dec.") ¶¶  2-3.  Based on the updated handbook, annual

10  counts of mail were not required after February 1998.  Tomlins Dec. ¶2.  Moreover, the absence

11  of route counts would affect all postal carriers.

12  Insofar as Plaintiff blames the mandatory postal form for an EEOC complaint because it

13  does not contain a box for "hostile work environment" or provide information about a hostile

14  work environment, this argument is unpersuasive.  The form directs the employee to explain the

15  actions or situation that resulted in discrimination and Plaintiff often provided a narrative

16  attachment.  For example, in Case 2, Plaintiff checked multiple boxes and attached a typewritten

17  narrative complaint.  Exhibit 1 to Wallace Dec at U.S. 7253, 7255.  In Cases 3, 4 and 5

18  (consolidated in formal complaint), Plaintiff did not check any box, but provided attachments.

19  Declaration of Debbie O. Cabato ("Cabato Dec.") Ex. 8.  In Case 6, Plaintiff checked multiple

20  boxes and provided a written narrative attachment.  Cabato Dec. Ex. 34.

21  To the extent that Plaintiff also appears to blame the failure to assert hostile work

22  environment on EEO counselors, this argument is unsupported.  Plaintiff contends that the

23  administrative process required that his claims first be brought to a USPS EEO counselor.

24  According to Plaintiff, the EEOC required all EEO counselors to determine the issues and bases

25  of the potential complaint.  Plaintiff argues that knowing the volume of his cases, the repetition of

26  issues and the interrelationship of the alleged retaliation, "the EEO counselors were obligated to

27  determine if George's pro se cases involved an [sic] potential claim of a 'hostile work

28  environment.'"  Opposition, p. 9.  There is no support for Plaintiff's assertion that EEO counselors

1  should have reviewed all of Plaintiff's complaints over a 5½ year period and made an independent

2  determination that Plaintiff had a potential hostile work environment claim absent allegations by

3  Plaintiff linking those complaints.

4  Further, any effort by Plaintiff to link his EEO complaints appeared to be limited to claims

5  of retaliation.  For instance, in EEOC Case 3, Plaintiff alleged that the connection between his

6  prior EEO complaints and the actions in Case 3 was to "discourage and intimidate him from

7  continually attempting to uncover management's discriminatory practices."  Exhibit 3 to Wallace

8  Supp. Dec., at US 5156.  Plaintiff did not allege discriminatory conduct "so severe or pervasive

9  that it created a work environment abusive to [him] because of [his] race, gender, religion or

10  national origin." Harris, 510 U.S. at 22.  Instead, he alleged retaliatory conduct for filing EEO

11  complaints.

12  Plaintiff additionally argues that the actions of EEO counselors and Defendants are not

13  consistent with the holding in Federal Express Corp. v. Holowecki, 128 S.Ct. 1147, 1158 (2008).

14  The Federal Express court indicated that in the formal litigation context, pro se litigants are held

15  to a lesser pleading standard than other parties.  The court acknowledged that the Age

16  Discrimination in Employment Act, like Title VII, sets up a remedial scheme in which laypersons

17  are expected to initiate the process and the system "must be accessible to individuals who have no

18  detailed knowledge of the relevant statutory mechanisms and agency processes." Id.  Plaintiff

19  fails to explain how the actions of EEO counselors or Defendants are not consistent with Federal

20  Express.  Given the volume of his complaints, Plaintiff clearly had access to the system.[3]

21  Based on the above, Plaintiff failed to exhaust his administrative remedies.  Thus, this

22  Court lacks subject matter jurisdiction to consider the hostile work environment claim.

23  III.   Prima Facie Case of Discrimination

24  A.   Adverse Action

25  Defendants contend that Plaintiff cannot establish a prima facie case of discrimination in

26

27  [3]The Federal Express court acknowledged that "[r]easonable arguments can be made that the agency should

28  adopt a standard giving more guidance to filers," but that was a matter for the agency to decide. Id.

EEOC Cases 1 through 3, 6 and part of 7, because he did not suffer an adverse employment action.  In a Title VII action, the complainant carries the initial burden of establishing a prima facie case of discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  To establish a prima facie case of discrimination or retaliation, a plaintiff must show that he has been subjected to an adverse employment action.  Id.; Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000) (retaliation).  The action must be "final," as actions that are subsequently modified through an internal process are insufficient to constitute adverse employment actions.  See, e.g., Kortan v. Cal. Youth Auth., 217 F.3d 1104, 1112-13 (9th Cir. 2000) (holding that a poor job evaluation did not constitute an adverse employment action where it was later revised by another supervisor); Brooks v. City of San Mateo, 229 F.3d 917, 929-30 (9th Cir. 2000) (negative performance evaluation not an adverse employment action because it was subject to modification by the city).

Defendants indicate that what constitutes an adverse action for a discrimination claim differs from a retaliation claim.  According to Defendants, for discrimination, "an adverse employment action is one that 'materially affect[s] the compensation, terms, conditions, or privileges of ...employment.'"  Davis v. Team Electric Co., 520 F.3d 1080, 1089 (9th Cir. 2008).  For retaliation, an adverse action that does not alter terms or conditions of employment may suffice, but only if the action was "materially adverse," producing an injury or harm that is serious enough to "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination."  Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68 (2006) (internal quotations omitted) ("White"); see also Ray, 217 F.3d at 1243 (in retaliation cases, an action is an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity).

Plaintiff argues that Defendants' definition of adverse action is erroneous.  It is difficult to ascertain what Plaintiff believes is the correct definition or how it differs from the standard cited by Defendants.  Plaintiff spends time discussing the purpose of Title VII in "radically reshaping societal norms in a way that can facilitate meaningful change from the bottom-up" and the reporting of discrimination by victims generally.  Opposition, pp. 15-16.  Plaintiff also discusses protected activities under Title VII and what is actionable in a hostile work environment context.

There are ten additional pages of briefing regarding court holdings with no conclusion or analysis

to the present case.  Plaintiff states that retaliatory actions include any action that "well might have

dissuaded a reasonable worker from making or supporting a charge of discrimination."  White,

548 U.S. at 68.  However, this is the same standard that Defendants cited in their moving papers.

The Court now turns to the individual EEOC Cases at issue to determine whether Plaintiff

suffered an "adverse action."

Case 1:

In Case 1, Plaintiff was issued a 7-day suspension on October 30, 1996, after a customer

hit Plaintiff's mail delivery vehicle as she attempted to back out of her driveway.  Cabato Dec. Ex

2.  Defendants reduced the suspension to a letter of warning on January 2, 1997, through an

internal grievance process.  Cabato Dec. Ex. 3.  A USPS letter of warning does not constitute an

adverse employment action for purposes of Title VII in the discrimination context.  See, e.g.,

Ezell v. Potter, 400 F.3d 1041, 1049 (7th Cir. 2005) (in discrimination context, "letter of warning

is generally considered insufficient to qualify as an adverse employment action"); Watson v.

Potter, ― F.Supp.2d ―, 2009 WL 424467, *6 (N.D.Ill. Feb. 19, 2009), aff'd, 2009 WL 3634334

(7th Cir. Nov. 4, 2009).  Similarly, a USPS letter of warning constitutes an adverse employment

action in the retaliation context only if it would discourage a reasonable person from exercising

his rights.  Watson, 2009 WL 424467, at *6.  A reasonable person would not have been dissuaded

by the letter of warning and here, Plaintiff was most certainly not dissuaded from making charges

of discrimination as he engaged in EEO activity at least five times in the year following the letter

of warning, nor would.  Cabato Ex. 33.  Plaintiff has not disputed that the action in Case 1 was not

a final action.

Case 2:

In Case 2, Plaintiff complained that on June 9, 1997, he was denied EEO time and his

supervisor followed him while delivering his route.  He also complained that on June 11, 1997,

his supervisor talked to him about his lifting technique and street time usage.  Cabato Dec. Ex. 4.

Plaintiff has admitted that he did not receive any discipline in connection with these events and

that his supervisor gave him time to complete an EEO affidavit.  George Dep. 250:21-251:16;

Cabato Dec. Ex. 1 at 7 (EEO findings noting Plaintiff "admitted his supervisor ultimately granted his request for administrative time to work on EEO affidavit").

Case 3:

In Case 3, Plaintiff's supervisor issued a letter of warning on October 28, 1997, regarding Plaintiff's failure to follow instructions and working unauthorized overtime on October 22, 1997. Cabato Dec. Ex. 5.  In February 1998, the letter was reduced to documented instructions about not exceeding authorized overtime.  Cabato Dec. Ex. 10.  As noted, a USPS letter of warning does not constitute an adverse employment action for purposes of Title VII in the discrimination or retaliation context.  Ezell, 400 F.3d at 1049;  Watson, 2009 WL 424467, at *6.  That the letter subsequently was reduced to documented instructions also does not constitute an adverse employment action because there is no indication that instructions affect material conditions of employment or deter a reasonable employee from engaging in EEO activity.  Plaintiff has not disputed that the actions in Case 3 were not final or that the letter was reduced to instructions and later removed from his file.  SUF 25.

Case 6:

In Case 6, Plaintiff challenged a letter of warning and two suspensions issued in November 2000.  USPS rescinded the November 29, 2000, suspension and reduced the November 22, 2000, suspension to a letter of warning.  Cabato Dec. Exs. 29, 30.  Accordingly, the two suspensions were not final actions.  Further, the resulting two letters of warning were not final adverse actions because Plaintiff engaged in EEO activity in the following four months and the letters did not affect the terms and conditions of his employment.  Cabato Dec. Ex. 33 at 680; Ezell, 400 F.3d at 1049;  Watson, 2009 WL 424467, at *6.

Plaintiff asserts that Defendants "cannot deny these letters of warning and suspension have caused him to be aggrieved as USPS used them in determining his removal."  Opposition, p. 15. Plaintiff correctly notes that the April 9, 2001 Notice of Proposed Removal cited these letters. Cabato Dec. Ex. 20.  However, the May 1, 2001, final removal letter did not.  Cabato Decl. Ex. 21.

1    Part of Case 7:

2        Defendants contend that the April 9, 2001 Notice of Proposed Removal at issue in Case 7

3    is not a final action on its face.  Cabato Dec. Ex. 20.  Plaintiff has not disputed that this action was

4    not final.

5        Based on the above, Plaintiff has not established any adverse employment action in Cases

6    1 through 3, 6 and part of 7, and he cannot establish a prima facie case of discrimination in those

7    cases.

8    IV.    Similarly Situated Employees

9        Defendants assert that Plaintiff cannot establish a prima facie case of discrimination in any

10   of the EEOC Cases because he cannot show that similarly situated employees were treated more

11   favorably.  To establish a prima facie case of racial or sexual discrimination, a plaintiff must

12   establish, in part, that the employer treated the plaintiff differently than a similarly situated

13   employee who does not belong to the same protected class as the plaintiff.  Cornwell v. Electra

14   Cent. Credit Union, 439 F.3d 1018 (9th Cir. 2006) (discussing disparate treatment).  Individuals

15   are "similarly situated" when they "have similar jobs and display similar conduct."  Vasquez, 349

16   F.3d at 641 (concluding that employees were not similarly situated because co-worker did not

17   engage in problematic conduct of comparable seriousness to that of plaintiff).  Co-workers that do

18   not have as many violations are not similarly situated.  Leong v. Potter, 347 F.3d 1117, 1124 (9th

19   Cir. 2003) (district court did not err in holding that plaintiff failed to establish prima facie case of

20   discrimination where co-workers did not amass a comparable record of misconduct).

21       Although Plaintiff contends that Defendants have failed to show that other employees

22   were treated the same, it is Plaintiff's burden to establish a prima facie case of discrimination,

23   which includes showing that similarly situated individuals outside his protected class were treated

24   more favorably.  Leong, 347 F.3d at 1124 (citing McDonnell Douglas, 411 U.S. 792).  Plaintiff

25   has provided no evidence of comparable employees who had a similar history of violations and

26   engaged in similar conduct in any of the EEOC Cases.

27       As to Case 1,Plaintiff proffers no evidence of other carriers who received a letter for

28   failing to operate a vehicle in a safe manner less than one month prior to a vehicle accident and

yet received more favorable treatment.  Cabato Dec. Ex. 1, p.2; SUF 16; Exhibit 1 to Declaration of Elaine Wallace at US 6329.  This was Plaintiff's third accident in approximately three years, he had been given a letter of warning for one previous accident and received a letter of warning for the third that was removed from his record after a year.  Cabato Dec. Exs. 3 and 9; SUF 17.

In Case 2, Plaintiff admitted that he did not receive any discipline.  As such, there is no basis for holding that someone was treated better.

As to Cases 3, 4 and 5, Plaintiff submitted an affidavit, which purportedly contains signed responses from similarly situated peers to a questionnaire that he prepared.  Exhibit 3 to Wallace Supp. Dec. at US 5158-64.  Plaintiff asserts that this "evidence" shows 9 carriers admitting that they had gone over the time estimated on their Form 3996s, but only 1 indicated discipline; 9 carriers admitting they put personal items on the delivery tray and indicating they were never told they could not do so; and 12 carriers admitting they do not always have their mail ready for delivery when they arrive at a house, with half indicting they had been told to have the mail ready.

Defendants request that the Court strike Plaintiff's affidavit exhibits submitted to the EEO as they are not authenticated under Federal Rule of Evidence 901 and constitute inadmissible hearsay under Rule 802.  The Court finds it unnecessary to strike the exhibits as they fail to establish that the individuals listed were similarly situated or were treated differently.  The exhibits do not identify the individuals' jobs, whether they had a comparable record of misconduct or if the conduct was of comparable seriousness.

As to Case 6, Plaintiff has offered no evidence of similarly situated carriers with a comparable record of misconduct.  Moreover, in the First Amended Complaint, Plaintiff admitted that others in his class (white, male carriers) were treated better than he was.  First Amended Complaint, pp. 9, 11.

As to Case 7, Plaintiff has not identified another employee who had been warned repeatedly and suspended twice for failing to follow instructions and engaging in conduct unbecoming a postal employee or causing his supervisors to call the police three times to have him removed from the premises.  Cabato Dec. Ex. 20 (Notice of Proposed Removal); Exhibit 1 to Declaration of Elaine Wallace, at US 5628-30.

1    Plaintiff argues that Defendants "made it impossible for the lack of similarly situated peers

2  to be presented," indicating that Defendants were notified in the administrative process of his

3  request for documents, that there are major gaps of documents that support numerous defenses

4  and that there are missing documents and/or evidence.  Opposition, p. 31.  For several pages,

5  Plaintiff discusses the duty to preserve relevant evidence, cases regarding spoilation and

6  destruction of evidence, cases regarding discovery disputes and postal policies regarding records

7  management.  Opposition, pp. 33-38.  Plaintiff concludes that USPS cannot deny that it withheld

8  material evidence concerning similarly situated peers.  Opposition, p. 39.  The Court has

9  addressed Plaintiff's arguments regarding missing documents and the lack of discovery.  As

10  noted, the parties engaged in the discovery process for more than four years with repeated

11  extensions and Plaintiff ultimately abandoned any effort to compel discovery.  Plaintiff has not

12  provided factual support demonstrating that the requested discovery exists or that Defendants

13  have withheld documents.

14  V.    Job Performance

15    Defendants contend that Plaintiff cannot establish a prima facie case of discrimination in

16  Cases 3 through 7 because his job performance was not satisfactory.  To establish a prima facie

17  case of discrimination, a plaintiff must offer proof that he performed his job satisfactorily.

18  Cornwell, 439 F.3d at 1028 (disparate treatment).

19    Although Plaintiff asserts that he has met the element of satisfactory performance and

20  demonstrated that he meets Merced's evaluated standards for use of route time, this assertion is

21  unsupported.  Plaintiff cites his former Statement of Facts Nos. 3 through 5.  These "facts"

22  include a series of time calculations regarding adjusted street times, which rely heavily on a route

23  evaluation conducted in April 1998.  As previously stated, the use of a route evaluation conducted

24  in April 1998 does not support an inference that Plaintiff met any adjusted route times in 2001.

25  Additionally, Plaintiff does not provide evidence of mail volume on the days in question.

26  Regardless of estimated or actual route times, Plaintiff exceeded the amount of overtime that was

27  authorized on more than one occasion in 2001, despite warnings by his supervisors.

28    In further support of his argument, Plaintiff contends that it is Defendants' burden of

persuasion regarding his poor performance, citing multiple block quotes regarding the burden of production and persuasion in discrimination cases.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).  He also discusses a distinction between performance and conduct, asserting that Defendants' claims of his performance deficiencies are a defense.  However, Plaintiff's own citations makes it clear that it is his burden to establish a prima facie case.  St. Mary's Honor Ctr., 509 U.S. at 506 ("The plaintiff in [a Title VII discriminatory treatment] case must first establish, by a preponderance of the evidence, a "prima facie" case of racial discrimination").

Plaintiff also asserts that the elements of a prima facie case for retaliation do not include an element of satisfactory performance.  Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991) ("Under Title VII, to make out a prima facie case of retaliation, a plaintiff must show participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action.").  However, the Court has previously determined that Plaintiff has not established any adverse employment action in Cases 1 through 3, 6 and part of 7.

V.    Legitimate, Non-Discriminatory Reasons

Defendants argue that even if Plaintiff could establish a prima facie case in any of his EEOC cases, Defendants had a legitimate, non-discriminatory reason for its actions in those cases. As stated, in a Title VII action, if a plaintiff makes out a prima facie case of discrimination or retaliation, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Leong, 347 F.3d at 1124 (citing McDonnell Douglas, 411 U.S. 792).  "Although the burden of production shifts to the defendant at this point, the burden of proof remains with the plaintiff at all times."  Leong, 347 F.3d at 1124.  If the employer offers a nondiscriminatory reason, the burden returns to the plaintiff to show that the articulated reason is a pretext for discrimination.  Id.

Case 1

In Case 1, Defendants issued Plaintiff a letter of warning for failing to operate a vehicle safely.  Plaintiff does not dispute that he parked his vehicle in front of a customer's home, the customer hit his vehicle and that Carl Thornton concluded the he had parked his vehicle to block

1    the driveway.  Plaintiff also does not dispute that he received a letter of warning for failing to

2    operate a vehicle in a safe manner less than one month earlier.  As these are the reasons given for

3    the letter of warning, Defendants had a legitimate, non-discriminatory reason for their actions.  St.

4    Mary's, 509 U.S. at 509.

5           Case 2

6           In Case 2, Plaintiff alleges that after he requested time to do an EEO affidavit on June 9,

7    1997, Hoskins followed him while he was delivering mail and talked to him about his lifting

8    technique.  Hoskins also questioned him on June 11, 1997, about how much time it took to deliver

9    his route.  Plaintiff acknowledges that street observation by supervisors is part of their normal

10   duties and that he didn't use proper lifting technique with a parcel on June 9, 1997.  SUF 20 and

11   Plaintiff's Admissions and Denials.  He also admits that he did not receive any discipline in

12   connection with these events.  SUF 21; George Dep. 250:21-251:13.

13          In his opposition, Plaintiff does not argue that he did not engage in the behavior alleged.

14   Instead, Plaintiff chastises Defendants for failing to explain why his supervisor, Hoskins,

15   allegedly violated vehicle safety rules when he stopped his vehicle in the middle of the street and

16   left the motor running to question Plaintiff about his lifting technique.  Opposition, p. 43.

17   Plaintiff provides no evidence that Hoskins violated a vehicle safety rule.  Moreover, it is

18   irrelevant to whether Plaintiff engaged in the alleged behavior, which provides a legitimate reason

19   for Defendants' actions.

20          Case 3

21          In Case 3, Defendants initially issued Plaintiff a letter of warning for failing to follow

22   DeLeon's instructions and working unauthorized overtime on October 22, 1997.  The warning

23   letter was later reduced to documented instructions and subsequently removed from his file.  SUF

24   24-25.  Plaintiff admits that DeLeon approved one hour of overtime, but he used 2 hours and 35

25   minutes of overtime.  SUF 24 and Plaintiff's Admissions.

26          To argue pretext, Plaintiff asserts confusion about the consolidation of cases 3 through 5 in

27   one EEOC charge.  He contends that his issues were never clarified, noting he listed cases 3, 4 and

28   5 separately in the this action.  The assertion of confusion does not demonstrate that Defendants'

22

1   reasons for ultimately issuing instructions were pretext.

2        As to the use of unauthorized overtime, Plaintiff complains that it is Defendants' burden

3   to articulate a "legitimate" reason for the time allocated to Plaintiff.  He again complains that

4   Defendants did not disclose material evidence of the normal street time or to show that Plaintiff

5   exceeded the standard evaluated time for delivery.  However, Plaintiff's arguments that

6   Defendants did not conduct route counts or route adjustments in Merced would apply equally to

7   all carriers, and does not provide evidence that Defendants' reasons were pretext for

8   discrimination.  As previously noted, Plaintiff has not submitted evidence that other similarly

9   situated employees were treated differently.  Furthermore, Plaintiff has not disputed that he used

10  unauthorized overtime, undercutting any argument that Defendants' reasons for issuing

11  instructions not to take unauthorized overtime were pretextual.

12      Case 4

13      In Case 4, DeLeon observed that George had placed his lunch pail on the mail delivery

14  tray next to him in his vehicle, even though DeLeon had previously told him not to do so because

15  it was taking up space that should be occupied by mail.  SUF 27; Exhibit 3 to Wallace Supp. Dec.,

16  at US 5155.  DeLeon issued Plaintiff a notice of a 7-day suspension for failing to follow

17  instructions. SUF 28.

18      In opposition, Plaintiff contends that Defendants have provided no postal rule concerning

19  placing a lunch pail on a vehicle's delivery tray.  He argues that he followed what he believed the

20  instructions were regarding lunch pails.  However, Plaintiff acknowledges that DeLeon previously

21  instructed him not to put his lunch pail on the mail delivery tray and that he had his lunch pail on

22  the tray on the day in question.  Opposition, pp. 46-47.  As such, Defendants have articulated a

23  legitimate, non-discriminatory reason for issuing the notice of 7-day suspension.  Plaintiff has

24  proffered no evidence suggesting that Defendants' reasoning was a pretext.

25      Case 5

26      In Case 5, Hoskins issued Plaintiff a notice of 14-day suspension for not having his mail

27  ready at several deliveries and for backtracking, despite being previously instructed to have mail

28  ready for delivery and to avoid backtracking.  SUF 30-31.  Plaintiff admits he did not have mail

ready at deliveries, he had to backtrack to deliver a parcel and he received help to deliver his route.  Exhibit 3 to Wallace Supp. Dec., at US 5155-56.  Accordingly, Defendants have provided a legitimate, non-discriminatory reason for their actions.

In challenging Defendants' reason, Plaintiff alleges that on the date in question, he filled out a request for overtime.  The supervisor told him to take it back and think about it.  Plaintiff resubmitted the request and the supervisor said he was going to follow Plaintiff on his delivery route.  Plaintiff asserts that Defendants never articulated a legitimate reason for determining that his estimate was outside the normal standard evaluated times adjusted for the volume of mail needed to be delivered.  Opposition, p. 47.  However, Plaintiff was not being disciplined for exceeding his overtime estimate.  Cabato Ex. 7.

Case 6

Case 6 concerns three actions by Defendants.  The first action involved a November 22, 2000, letter of warning for failing to follow instructions on October 23, 2000, and for taking unauthorized overtime on November 11, 2000.  SUF 36.  Defendants assert that the November 22, 2000, letter was issued because (1) Plaintiff disregarded Rhoades' instruction to go back to work and complained to the Postmaster instead; and (2) Plaintiff took almost two hours of unauthorized overtime on November 11.  Plaintiff has not disputed the underlying reasons given for issuance of the November 22, 2000 letter, namely disregarding Rhoades' orders and taking unauthorized overtime.  As such, Defendants have offered legitimate, non-discriminatory reasons for its action.

To demonstrate pretext, Plaintiff responds that there is a genuine issue of fact regarding whether or not Rhoades agreed to give Plaintiff the requested time to see a union steward on October 23, 2000.  However, Plaintiff's cited deposition testimony demonstrates that he received time for union activity, but he and Rhoades argued about whether he should get more time.  George Dep. 313:25-316:8.  Regardless of any purported factual dispute regarding the request for union representation, Plaintiff admits that he did not follow his supervisors instructions.

The second action in Case 6 involved a November 22, 2000, suspension notice (reduced to a letter of warning) issued to Plaintiff for unbecoming conduct based on calling his supervisor a hypocrite and a liar.  SUF 37-39.  The third action concerned a November 29, 2000, suspension

1  notice (subsequently rescinded) for calling Rhoades names, e.g. "tightwad." SUF 40-41. As to

2  these remaining actions, Plaintiff has not challenged that he engaged in the name calling behavior.

3  George Dep. 332:11-16; 342:15-22; 343:14-24. Plaintiff also has not proffered evidence to satisfy

4  his burden to demonstrate pretext.

5       Case 7

6       In Case 7, Plaintiff does not dispute that he repeatedly worked unauthorized overtime in

7  January, February, and March 2001. SUF 44-46. He also has not disputed the facts underlying

8  the notice of removal. SUF 47, 49-54. Of importance, Plaintiff admits (1) Anderson repeatedly

9  instructed him to leave the premises, (2) Plaintiff "just lost it" and was angry (3) Plaintiff told

10  Anderson "if I don't leave, what are you going to do about it," (4) despite Anderson's repeated

11  instructions to leave the premises, George was still in the facility when the police arrived; (5) after

12  leaving, he returned and he police told him to go home again. SUF 50-54 and Plaintiff's

13  Admissions; George Dep. 411:21-24.

14       In opposition, Plaintiff attempts to justify his behavior and to allege that there are disputed

15  facts. He speculates about what a trier of fact could find, such as (1) that when he clocked out he

16  intended to leave; (2) that his clocking out ended his requests at the supervisor's desk for 3996

17  forms; (3) that the supervisor re-engaged him after he clocked out; (4) that he had not threatened

18  Anderson with violence; and (5) Anderson's assertion of fear was unreasonable.

19       Plaintiff has admitted that he repeatedly was instructed to leave, but did not do so until the

20  police arrived. Plaintiff also has admitted that he was angry, "just lost it" and challenged

21  Anderson by telling him that "if I don't leave, what are you going to do about it." Further,

22  Plaintiff's evidence shows that Anderson believed Plaintiff was trying to pick a fight with him in

23  violation of USPS policies on violence in the workplace. Opposition, pp. 56-57; Deposition of

24  Ryan Anderson ("Anderson Dep.") 124:7-25; Cabato Dec. Ex. 28 ("**Violence** is not limited to

25  fatalities or physical injuries. It is recognized that any intentional works, acts or actions meant to

26  provoke another can escalate and result in injury if not immediately and appropriately addressed

27  by management."). Although Plaintiff attempts to point out evidence that Anderson did not feel

28  threatened, the cited testimony related to an incident involving a different postal employee.

1  Opposition, p. 57; Anderson Dep. 107:24-108:1.

2      The Court finds that Defendants have offered legitimate, non-discriminatory reasons for

3  their actions and Plaintiff has failed to satisfy his burden to show that the articulated reason is a

4  pretext for discrimination.  Leong, 347 F.3d at 1124 (citing McDonnell Douglas, 411 U.S. 792).

5  VI.    Privacy Act Violations and Spoilation

6      At the conclusion of his opposition, Plaintiff attempts to raise a Privacy Act claim

7  regarding files kept by DeLeon.  The Court finds it unnecessary to address Plaintiff's argument

8  because the First Amended Complaint does not include a Privacy Act claim.[4]

9                                  **CONCLUSION**

10     Based on the above, Defendants' Motion for Summary Judgment is GRANTED.

11

12  *IT IS SO ORDERED.*

13  *Dated:*   __April 5, 2010__          ___ */s/* **Dennis L. Beck** ___
                                            *UNITED STATES MAGISTRATE JUDGE*

14

15

16

17

18

19

20

21

22

23

24

---

25     [4]To the extent that Plaintiff is attempting to amend his complaint, he may not do so.  While leave to amend

26  is liberally granted under Fed. R. Civ. P. 15(a), undue delay, bad faith, prejudice to the opponent and futility of
    amendment are grounds for denial.  Loehr v. Ventura County Cmty. Coll. Dist., 743 F.2d 1310, 1319 (9th Cir. 1984).

27   Here, Plaintiff has not explained his delay and the addition of any claim may prejudice Defendants by necessitating
    further discovery.  Additionally, Plaintiff may not add a claim to avoid the possibility of an adverse summary

28  judgment ruling.  Acri v. International Ass'n of Machinists & Aerospace Workers, 781 F.2d 1393, 1398 (9th Cir.
    1986).